**ADAMS BROTHERS COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15207.**

United States Court of Appeals
Eighth Circuit.

May 12, 1955.

James W. R. Brown, Omaha, Neb. (James J. Fitzgerald, Jr., Omaha, Neb., on the brief), for petitioner.

C. Guy Tadlock, Special Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack, A. F. Prescott and Meyer Rothwacks, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before SANBORN, COLLET and VAN OOSTERHOUT, Circuit Judges.

COLLET, Circuit Judge.

The question for determination is whether money advanced as operating capital by a parent corporation to its wholly owned but independently operated subsidiary corporation was "borrowed

invested capital" as defined by Sec. 719 (a) (1) of the Internal Revenue Code of 1939, 26 U.S.C. 1952 ed., § 719. If it was, the subsidiary's excess profits taxes for the years involved, 1942 to 1945 inclusive, would be reduced accordingly. The Commissioner held the advances constituted an open account and did not qualify as borrowed invested capital under Section 719(a) (1). The Tax Court agreed. 22 T.C. 395. This petition to review followed.

Borrowed invested capital is defined in Sec. 719(a) (1) and (b) as follows:

"(a) *Borrowed capital.* The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

"(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, * * *

\* \* \* \* \* \*

"(b) *Borrowed invested capital.* The borrowed invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be an amount equal to 50 per centum of the borrowed capital for such day."

Treasury Regulations 112, Section 35.719–1, further define Borrowed Invested Capital:

"Sec. 35.719–1 *Borrowed Invested Capital.*—The borrowed invested capital for any day of the taxable year is 50 per cent of the borrowed capital for such day determined as of the beginning of such day. Borrowed capital is defined to mean:

"(a) Outstanding indebtedness (other than interest, but including indebtedness assumed or to which the taxpayer's property is subject) of the taxpayer which is evidenced by a bond, a promissory note, bill of exchange, debenture, certificate of

indebtedness, mortgage, or deed of trust, plus * * * ".

The facts upon which the present controversy arose are as follows. In January 1942 Adams Brothers Company, a corporation, had for several years been operating a wholesale grocery business in South Dakota with headquarters at Deadwood in that State. January 20, 1942 Paxton & Gallagher, a Nebraska corporation, with headquarters at Omaha, Nebraska, purchased all of the capital stock of Adams Brothers. We quote the following statement of salient facts from Respondent Commissioner's brief:

"Prior to the taxable period, the parent [Paxton & Gallagher] had for many years done business with Chase National Bank of New York and the Continental Illinois National Bank and Trust Company of Chicago, as well as with Omaha banks, and it had an excellent credit rating.

"In January, 1942, L. B. Long, the parent's secretary and treasurer, went to South Dakota to close the parent's purchase of the taxpayer's [Adams Brothers] stock. Long installed a new manager, and conferred with him and with taxpayer's vice-president upon methods of operation and financing needed by the taxpayer because of a contemplated expansion of its business. They considered obtaining a straight loan of a flat amount from the parent and giving a 12-month note therefor, but decided to provide funds in the amount of the taxpayer's actual needs.

"The plan adopted was that the taxpayer would forward its purchase invoices and other expense bills to the parent in Omaha for payment. The taxpayer would deposit all collections on sales to the account of the parent in banks in South Dakota. All inter-company transactions reflecting payments of invoices and expenses and deposits of collections on sales were recorded on the taxpayer's books. The parent main-

tained similar ledger accounts on its books which also reflected all inter-company transactions. At the end of each month, the taxpayer's book-keeper would forward to the parent company, for reconciliation, a complete summary of deposits and advances as reflected on the ledger accounts on the taxpayer's books. The taxpayer was to give a note bearing five percent interest for any excess of advances over deposits.

"At the end of each month during the taxable years the banks in South Dakota sent the parent duplicate deposits slips showing the taxpayer's deposits of cash collections on sales. The totals were recorded on the parent's books. Payments of purchase invoices and other expenses relating to the taxpayer's business were also recorded. At the close of January, 1942, the books of the taxpayer and of the parent disclosed that the advances made by the parent to the taxpayer exceeded the deposits received from the taxpayer by the amount of $5,662.66. Thereafter, the taxpayer's treasurer signed a note in the following form:

"$5,662.66  January 31, 1942

"One month after date we promise to pay to the order of Paxton & Gallagher Company Five thousand, six hundred sixty-two and 66/100 Dollars, Payable at—Value received with interest at 5 per cent per annum.

"Adams Brothers Co.,
(S) L. B. Long,
*Secretary.*

"After the close of the months in 1942 designated below, the books showed that the deposits received by the parent exceeded the advances, and its treasurer signed notes for the excesses in the following amounts, payable to the taxpayer:

"February     $52,039.21
"March        52,190.85
"April        13,317.64

"After the close of May, 1942, the books showed that the amounts of advances exceeded the deposits and the taxpayer issued its note to the parent for the excess, in the amount of $31,052.54.

"At the end of each succeeding month during 1942, and at the end of each 28-day period during 1943, 1944, and 1945, the amounts of the advances and deposits were ascertained from the parent's records. In all these periods the amounts advanced by the parent exceeded the deposits and the taxpayer issued its note to the parent for the new balance due. All the notes provided for interest at the rate of five percent, and were due either one month or 28 days from date. Each time a new note was given the old note was marked canceled. The notes were kept in a safe in the parent's office.

"Each year in December, the interest accruing was computed and was then included in the amount of advances for December in computing the net amount due the parent. No interest was charged on the advances until they were incorporated into a note. The indebtedness was shown as 'Notes Payable' on the taxpayer's balance sheets and income tax returns.

"On July 1, 1942, the taxpayer purchased all the assets of Western Liquor Company, a South Dakota corporation. For this purchase, the parent loaned the taxpayer $184,-991.79, for which the taxpayer gave its promissory note. [The amount of this note was allowed by the Commissioner as borrowed invested capital.]

"After July 1, 1942, the taxpayer conducted a wholesale liquor business under the name of Western Wholesale Liquor Company. This business was kept separate from the fruit and grocery business, with separate records and headquarters.

"The parent paid the purchase invoices of the taxpayer's liquor division, and collections from that division's sales were deposited to the parent's account. During 1944 and 1945, the deposits from these sales exceeded the advances made by the parent to the taxpayer. At the close of each 28-day period during those years the parent gave the taxpayer its note for the excess of deposits over advances.

"The taxpayer had no more than two notes outstanding at any time during the taxable years and did not maintain a notes payable ledger. The parent did not negotiate any of the notes issued by the taxpayer, and did not pledge any as security for loans.

"The taxpayer maintained a ledger account entitled 'Paxton & Gallagher Co., Omaha—Current Account' for each of the grocery and liquor divisions, keeping a running record of advances and deposits. The balances fluctuated almost daily.

"In its excess profits tax returns filed for the calendar years 1942 to 1945 inclusive, the taxpayer computed its excess profits credit based on its invested capital and claimed an average borrowed capital and an average borrowed invested capital for the years indicated as follows:

| "Year | Average Borrowed Capital | Average Borrowed Invested Capital |
|---|---|---|
| 1942 | $194,901.59 | $ 97,450.80 |
| 1943 | 455,367.34 | 227,683.67 |
| 1944 | 369,522.43 | 184,244.91 |
| 1945 | 305,045.50 | 152,522.75 |

"The borrowed capital included the amounts advanced for the grocery business by the parent, reduced by the amounts shown on the liquor division account as owing from the parent company to the taxpayer."

The Tax Court, in holding that the indebtedness was an open account which did not qualify it as borrowed capital under Sec. 719(a) (1), said that the only apparent purpose in the execution of the notes was an attempt to qualify the open account as borrowed capital and disregarded the notes on that ground.

The indebtedness was not disputed. All of the evidence showed it was for money advanced by Paxton & Gallagher to Adams Brothers as operating capital. It had none of the attributes incident to an open account except that it was evidenced by a daily running account of the amount advanced. When the balance was struck each month and notes were given for the balances, it lost that attribute. The indebtedness was borrowed capital and there is no evidence to justify any other conclusion. Under a somewhat similar arrangement money advanced under a factoring agreement was held to be borrowed capital in Brewster Shirt Corp. v. Commissioner, 2 Cir., 159 F.2d 227. That it was evidenced by a running account is also indisputable. The Tax Court concluded that the running account was the real evidence of indebtedness, that the indebtedness was an open account, and that the notes should be disregarded because they were given for the sole purpose of attempting to qualify the indebtedness as borrowed capital. If the indebtedness was in the nature of an open account it did not qualify as borrowed capital under Sec. 719(a) (1) in whatever manner it was evidenced. For, as has been so frequently held, the real nature of the transaction will control. The manner in which records are kept will be disregarded for tax purposes if and when the manner of keeping records distorts the realities. And when a sham or device is resorted to for the purpose of distorting the true situation the resulting smoke screen will be pierced to ascertain the truth. Those principles have become academic. By the same token, borrowed capital will continue to be borrowed capital regardless of how it may be evidenced. Hence, if borrowed capital is evidenced by a running account or a daily ledger and also by a note, the fact that one of the evidences is a run-

ning account will not destroy its true nature. Here the indebtedness was borrowed capital from the outset of the transactions between the lender and the creditor. It continued to be, although a running account or a daily ledger evidenced its fluctuating volume until the end of each month. Since the indebtedness, although borrowed capital, did not qualify as such under Section 719 unless it was evidenced by a note or other specific form of evidence specified therein, the question becomes whether the Commissioner was justified in ignoring the notes upon the ground that their execution was for the sole purpose of securing tax advantage under Section 719.

An act of formal compliance with the law, a usual, proper, ordinary, and frequently required act in ordinary business transactions, not illegal, not a sham or device of concealment, not distorting or changing the true nature of a transaction, may not be disregarded and compliance denied because the act was for the purpose of compliance. By the requirement that borrowed capital must be evidenced by a note, bond, mortgage, etc., Congress intended to limit borrowed capital for the purpose of computing excess profits taxes to the kinds of indebtedness which by their nature were properly and ordinarily evidenced in the manner required by Sec. 719. Congress considered broadening the nature of the instruments which would qualify an indebtedness as borrowed capital but did not do so (see Bernard Realty Co. v. United States, 7 Cir., 188 F.2d 861), no doubt because to do so might permit some kinds of indebtedness not really constituting borrowed capital to qualify as such. But certainly Congress did not intend that an indebtedness which was really borrowed capital would be denied that classification merely because the taxpayer gave a bona fide note for the purpose of meeting the formal requirement of the law. The execution of the notes was a legitimate act normally, properly, and characteristically incident to indebtedness of this nature. Under such circumstances, even if the notes were executed for the sole purpose of formally qualifying the indebtedness as borrowed capital under Section 719, the motive for the execution of the notes was a proper motive and the qualifying act may not be disregarded because of that motive. Of course, the execution of the notes, even for that motive alone could not change the nature of the indebtedness from borrowed capital to an open account. The following from Meier v. Commissioner, 8 Cir., 199 F.2d 392, 395, adequately states the applicable rule:

"It has repeatedly been said that taxation looks to the substance of transactions, and not to their form. Aside from any question of motive, a plan, scheme or device will be judged by what it is, and not what it pretends to be. See Gregory v. Helvering, 293 U.S. 465, 469–470, 55 S.Ct. 266, 79 L.Ed. 596, and Helvering v. Johnson, 8 Cir., 104 F.2d 140, 143."

We conclude that the Tax Court misapplied the sham and device rule in this case.

But aside from, and in addition to the foregoing conclusions, we find no justification in the record for the inference that the notes were executed for the sole purpose of attempting to qualify the indebtedness as borrowed capital under Section 719 to obtain a tax advantage. There is no contradiction of the testimony that this method of financing was adopted for the following purposes, (1) of avoiding the making of a long term loan for a fixed amount with the attending probability that all would not be needed and Adams Brothers be charged for interest on unneeded funds, (2) to take advantage, on behalf of Adams Brothers, of the high credit standing of Paxton & Gallagher and the correspondingly low rate of interest at which it could and did borrow the needed capital and (3) to avoid more complicated and expensive bookkeeping practices.

Adams Brothers and Paxton & Gallagher were keeping their business transactions separated for legitimate business reasons. Each was charging the other interest on balances between advances and deposits. An arrangement for determining the amount of interest due each

which would have necessitated the striking of a balance each day and calculating the interest on each daily balance throughout the year would have greatly increased bookkeeping expenses. It was not an unreasonable arrangement giving rise to a suspicion of lack of bona fides that the balances be struck each month and such balance constitute the basis for calculation of interest until the succeeding monthly balance was made. The Commissioner discredits the method followed by pointing out that the monthly balance did not continue to represent the actual balance throughout the succeeding month. But we see nothing suspicious about the practice followed. It appears to have been a reasonable method to follow in determining interest on the constantly fluctuating balances. Although the rulings of the Tax Court are presumptively correct, since there was no dispute about what the practice was, we find no justification for an inference that there was no reason for it.

When Adams Brothers purchased the Liquor Company in July 1942 it and Paxton & Gallagher arranged for the operation of the liquor business entirely separate from the other business operations of Adams Brothers. That was accomplished by operating the liquor business as a separate department. The loans made by Paxton & Gallagher for the operation of the liquor business were handled in the same manner as those made for Adams Brothers' grocery business operations. And the deposits made of collections from the liquor business were, like the deposits from Adams Brothers grocery business, deposited in a bank to the credit of Paxton & Gallagher and a balance between advances from Paxton & Gallagher to Adams Brothers for the liquor business and the deposits to the credit of Paxton & Gallagher from the liquor business operations was struck each month. A note was given by Adams Brothers to Paxton & Gallagher if the balance was in favor of the latter and if it was in favor of Adams Brothers, Paxton & Gallagher gave its note to the former. During the years 1944 and 1945 the balance

was constantly in favor of Adams Brothers on the liquor business. In its tax returns for those two years covering all operations—both liquor and grocery—Adams Brothers deducted the amount of Paxton & Gallagher's note indebtedness to it from the liquor department operations, from the amount it owed Paxton & Gallagher on account of advances for the grocery business in arriving at the amount of borrowed capital claimed in its tax return. Adams Brothers now contends that it deducted the amount of the notes owing to it from Paxton & Gallagher erroneously because there was no agreement between it and Paxton & Gallagher that the debts should be automatically offset, in the absence of which there can be no application of cross-debts between the debtor and creditor. Although the question was there raised, the Tax Court did not reach this issue for decision. It is submitted to us upon this record. Both parties brief the question. Under those circumstances, it will be determined.

It should now be clear that transactions will be viewed realistically for tax purposes and treated as what they actually amount to. If, for purposes of their own, Adams Brothers and Paxton & Gallagher saw fit to treat the latter's transactions with the liquor department of Adams Brothers' business entirely separate from other operations of the latter, that could not alter the actual amount of capital borrowed by Adams Brothers from Paxton & Gallagher within the meaning and intent of the Revenue Act. Realistically, it was the intention of the parties that Adams Brothers should owe Paxton & Gallagher only the difference between the notes it owed Paxton & Gallagher and the notes Paxton & Gallagher owed it. Recognizing that fact, Adams Brothers made its tax returns for 1944 and 1945 accordingly. The balancing of the outstanding notes was a proper way to determine the amount of outstanding indebtedness Adams Brothers owed Paxton & Gallagher for borrowed capital under the circumstances of this case. And if, as Adams Brothers contends, there must be, legalistically, a consent be-

tween creditor and debtor as a prerequisite to off-setting debts, such consent will be inferred from the conduct of the parties.

■ Bailey v. Commissioner, 5 Cir., 103 F.2d 448, is relied on as requiring a different result. But in that case the purpose of and the action taken by the parties was different. The Court applied the purpose evidenced by their acts. We do the same here. In the case before us, one of the important purposes in handling the loan advances in the manner it was done was to hold down the indebtedness from Adams Brothers to Paxton & Gallagher to the actual requirements of the former. The offsetting of the liquor department notes in 1944 and 1945 against Adams Brothers notes to Paxton & Gallagher was consistent with this objective and purpose, and inconsistent with the theory that there was no offset intended.

The judgment of the Tax Court is reversed and the cause is remanded with directions to compute the tax due and enter judgment in accord with this opinion.