ASHEVILLE MICA COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67351. Filed June 30, 1960.

*James F. Armstrong, Esq., Walter F. Gibbons, Esq., James T. Lodge, Esq.,* and *John M. Regan, Esq.,* for the petitioner.

*John A. Dunkel, Esq.,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in income tax against petitioner for the calendar years 1950 and 1952 in the amounts of $17,410.76 and $1,797.30, respectively. Petitioner claims an overpayment in 1952 in the amount of $500.93 based upon an additional deduction of $963.34 for State income taxes, the right to which respondent concedes.

The only issue is whether petitioner's accounts receivable due from related corporations to which petitioner was at the same time indebted are includible in its "total assets" in computing its substituted average base period net income under section 444, I.R.C. 1939, for purposes of the excess profits tax credit.

FINDINGS OF FACT.

The facts stipulated are so found.

Petitioner is a corporation organized under the laws of the State of Delaware with present principal office at 271 Church Street, New York, New York. During the years 1947 through 1954 the principal office was located at Newport News, Virginia. The returns for the calendar years 1950 and 1952 were filed on an accrual basis with

the collector or district director of internal revenue for the Lower Manhattan District of New York.

Petitioner and A. O. Schoonmaker Insulation Company, Inc., a New York corporation, hereafter referred to as Schoonmaker, were incorporated in 1928 by W. E. Blood and two of his uncles, W. Vance Brown and S. Herbert Brown. During the years 1947 through 1954, all of the stock of both corporations was held by the same individuals, each holding the same interest in one corporation that she or he held in the other. Blood held 33⅓ per cent of the common stock of both petitioner and Schoonmaker, while the remainder of common stock and all of the preferred stock of both corporations were divided among the widow of S. Herbert Brown and the four children of W. Vance Brown. During these years Blood served as a director and as president of both corporations; the other directorships and officer positions of the two corporations were held by members of the W. Vance Brown and Blood families.

From their incorporation until 1947, petitioner and Schoonmaker were both engaged in the business of buying, fabricating, and selling mica. Petitioner's plant was located at Asheville, North Carolina, and Schoonmaker's at New York, New York. Until 1942 the two corporations were operated on a generally competitive parallel basis. During World War II both corporations shifted their major effort to military needs. The termination of the war found petitioner in a poor financial condition and Schoonmaker in a good one. To eliminate a duplication of inventories and a differential of wage and freight rates, as well as duplications of manufacturing and sales facilities, it was decided to alter the method of operations of the two corporations by functionally dividing them, petitioner to become the processor or "fabricator" of raw mica and Schoonmaker to become the sales agency for the fabricated mica. The details and final decision with respect to this functional division were reached in a series of informal meetings of the shareholders in 1947; they were not reduced to a written agreement between the two corporations.

Pursuant to the plan agreed upon, all of the fabricating machinery of Schoonmaker, its inventory of raw unfabricated mica and its inventory of imported raw mica held in bond were transferred to petitioner in 1947. Petitioner was billed by Schoonmaker for $258,534.82 for the mica inventory and machinery, and $165,631.53 for the mica in bond. These amounts, representing the cost of the mica inventory and the cost less depreciation of the machinery as entered on the books of Schoonmaker, were entered on the books

of petitioner as accounts payable due Schoonmaker. At the time of this transaction petitioner was indebted to a bank in the amount of $50,000 and had no resources with which to pay for the items transferred.

Petitioner's plant was inadequate to house the fabricating facilities of both corporations and as a result petitioner leased new and larger premises in Newport News, Virginia, into which all, except one, of its activities were moved. One line of the mica business was retained in Asheville.

In 1947, upon execution of the plan of division, A. O. Schoonmaker Company, Inc., changed its name to Asheville-Schoonmaker Mica Company, Inc., hereafter also referred to as Schoonmaker.

Subsequent to the transfer of its fabricating facilities, Schoonmaker realigned itself into two divisions, the sales division and the import division. During the years 1947 through 1949, the functions of these divisions were as follows:

Sales Division:
(a) Handled substantially all of the sales of petitioner's fabricated mica with the exception of its ground mica, all of which petitioner sold direct.
(b) Handled substantially all sales of Schoonmaker's subsidiary Mica Company of Canada, which manufactured mica plate.
(c) Handled substantially all sales of ceramic capacitors manufactured by Maida Development Company.

Import Division:
(a) Imported mica from various places in the world, chiefly India, and sold it to customers, among which was petitioner.

The import division of Schoonmaker supplied an average of 76.08 per cent of the raw mica needs of petitioner during the years 1947 through 1954. The remaining raw mica was purchased by petitioner from different suppliers. As mica was purchased from Schoonmaker it would submit an invoice to petitioner. Upon receipt of the invoice petitioner would enter the amount of the purchase on its accounts payable. Schoonmaker would enter the same amount on its accounts receivable. In connection with substantially all sales to petitioner, Schoonmaker would receive an offer from a supplier and transmit the same to petitioner for acceptance or rejection. If accepted, Schoonmaker would place the order with the supplier. Upon arrival, the material would be delivered to petitioner and petitioner would be invoiced at cost plus 10, 12½, or 15 per cent depending upon the type of mica. In connection with sales made to purchasers other than petitioner, Schoonmaker would negotiate a selling price without revealing its cost and if agreement was reached, would accept the order and place it with a supplier or sell from stock.

The sales division of Schoonmaker during these years solicited orders for the fabricated mica of petitioner. Such orders were solicited in the name of Schoonmaker alone. Upon receipt of an order Schoonmaker would forward same to petitioner for acceptance. The mica, when fabricated, would be shipped by petitioner. The shipment would bear Schoonmaker labels and would be accompanied by a Schoonmaker invoice. Thereafter, Schoonmaker would debit its accounts receivable due from customers with the gross amount of the sale and credit the same less commission to its accounts payable due petitioner. The latter amount would be entered on petitioner's books as an account receivable due from Schoonmaker.

Prior to the reorganization of functions in 1947, accounts payable owed by petitioner to Schoonmaker were included with all of petitioner's other creditors in the firm's single account payable. In 1947, a new system of accounts was instituted which segregated each different type of transaction between petitioner and Schoonmaker. Eight separate accounts were created, as follows:

*Accounts Receivable:*

Sales Division—Regular Account.
Reflected sales (less commissions) of petitioner's fabricated mica made by Schoonmaker sales division.

Sales Division—Expense Account.
Reflected all net charges for sundry expenses (e.g., salaries, telephone and telegraph) paid by petitioner for the account of Schoonmaker sales division.

Import Division—Regular Account.
Reflected purchases of raw mica by the import division of Schoonmaker from petitioner. (Schoonmaker occasionally purchased raw mica from petitioner's inventory to sell to its other customers.)

*Accounts Payable:*

Sales Division—Regular Account.
Reflected petitioner's liability for mica purchased from Schoonmaker prior to August 1, 1947, plus chargebacks for cash discounts allowed to Schoonmaker's customers after August 1, 1947.

Sales Division—Expense Account.
Reflected all net charges for sundry expenses (e.g., salaries, telephone and telegraph) paid by Schoonmaker sales division for petitioner's account.

Sales Division—Special Account.
Reflected petitioner's liability for the mica inventory and machinery purchased from Schoonmaker in 1947 at the time of the division of functions.

Import Division—Special Account.
Reflected petitioner's liability for mica in bond purchased from Schoonmaker at the time of the division of functions.

Import Division—Regular Account.
Reflected petitioner's liability to Schoonmaker for imported raw mica purchased from Schoonmaker import division.

The activity of these accounts between 1947 and 1954 is summarized in the tables following (cents omitted):

668

SUMMARY OF ACCOUNTS RECEIVABLE DUE FROM SCHOONMAKER 1947–1954

| | Sales division—Regular account | | | Sales division—Expense account | | | Import division—Regular account | | |
|---|---|---|---|---|---|---|---|---|---|
| | Debit | Credit | Balance | Debit | Credit | Balance | Debit | Credit | Balance |
| 1/1/47 | $45,227 | -------- | $45,227 | -------- | -------- | -------- | -------- | -------- | -------- |
| 1947 | 938,029 | $418,829 | 564,426 | $18,362 | -------- | $18,362 | -------- | -------- | -------- |
| 1948 | 2,190,775 | 1,828,402 | 926,799 | 37,078 | -------- | 55,441 | -------- | -------- | -------- |
| 1949 | 1,679,070 | 1,516,071 | 1,089,798 | 25,226 | $2,445 | 78,224 | $41,475 | -------- | $41,475 |
| 1950 | 2,210,763 | [1] 2,096,949 | 1,203,611 | 23,647 | -------- | 101,871 | 123,382 | -------- | 164,858 |
| 1951 | 2,833,488 | [2] 2,162,000 | 1,875,100 | 29,364 | -------- | 131,236 | 120,023 | -------- | 284,881 |
| 1952 | 2,743,231 | 1,945,000 | 2,673,331 | 32,197 | -------- | 163,434 | 202,047 | -------- | 486,929 |
| 1953 | 2,607,251 | 1,895,000 | 3,385,583 | 35,755 | -------- | 199,189 | 38,965 | -------- | 525,894 |
| 1954 | 1,762,844 | 1,050,000 | 4,098,428 | 25,434 | 646 | 223,976 | 96,837 | -------- | 622,732 |

[1] This credit includes a cash payment of $500,000 made by the sales division of Schoonmaker to its import division on the latter's account receivable due from petitioner; this is reflected on petitioner's books as a payment to petitioner on its account receivable due from Schoonmaker and a payment by petitioner on its account payable due to the import division.

[2] Same as footnote 1 during the year 1951 but in the amount of $200,000.

SUMMARY OF ACCOUNTS PAYABLE DUE TO SCHOONMAKER 1947–1954

| | Sales division—Regular account | | | Sales division—Expense account | | | Sales division—Special account | | |
|---|---|---|---|---|---|---|---|---|---|
| | Debit | Credit | Balance | Debit | Credit | Balance | Debit | Credit | Balance |
| 1/1/47 | | $11,567 | $11,567 | -------- | -------- | -------- | -------- | -------- | -------- |
| 1947 | $38,864 | 246,261 | 218,964 | -------- | $19,781 | $19,781 | -------- | $257,869 | $257,869 |
| 1948 | -------- | [3] (122,495) | 96,468 | -------- | 39,608 | 59,390 | -------- | [3] (1,348) | 256,521 |
| 1949 | -------- | 21,433 | 117,902 | -------- | 13,191 | 72,581 | -------- | 2,013 | 258,534 |
| 1950 | -------- | 22,879 | 140,782 | -------- | 16,412 | 88,993 | -------- | -------- | 258,534 |
| 1951 | -------- | 30,511 | 171,293 | -------- | 13,377 | 102,371 | -------- | -------- | 258,534 |
| 1952 | -------- | 26,503 | 197,796 | -------- | 16,292 | 118,664 | -------- | -------- | 258,534 |
| 1953 | -------- | 26,419 | 224,216 | -------- | 10,586 | 129,250 | -------- | -------- | 258,534 |
| 1954 | -------- | 17,787 | 242,004 | -------- | 9,944 | 139,194 | -------- | -------- | 258,534 |

| | Import division—Special account | | | Import division—Regular account | | |
|---|---|---|---|---|---|---|
| | Debit | Credit | Balance | Debit | Credit | Balance |
| 1/1/47 | -------- | -------- | -------- | -------- | -------- | -------- |
| 1947 | -------- | $165,631 | $165,631 | -------- | -------- | -------- |
| 1948 | -------- | -------- | 165,631 | -------- | $528,718 | $528,718 |
| 1949 | -------- | -------- | 165,631 | -------- | 323,914 | 852,632 |
| 1950 | -------- | -------- | 165,631 | [4] $500,000 | 441,902 | 794,534 |
| 1951 | -------- | -------- | 165,631 | [5] 302,433 | 1,157,038 | 1,649,139 |
| 1952 | -------- | -------- | 165,631 | -------- | 1,096,995 | 2,746,135 |
| 1953 | -------- | -------- | 165,631 | -------- | 828,002 | 3,574,138 |
| 1954 | -------- | -------- | 165,631 | -------- | 495,028 | 4,039,167 |

[3] An adjustment to correct a billing error.
[4] See footnote 1 for accounts receivable.
[5] See footnote 2 for accounts receivable.

The open balances on these accounts as of December 31, 1949, totaled as follows:

*Accounts receivable:*

Sales division—Regular account _____ $1,089,798.19
Sales division—Expense account _____ 78,224.82
Import division—Regular account _____ 41,475.78

Total _____ 1,209,498.79

*Accounts payable:*

| | |
|---|---|
| Sales division—Regular account | 117,902.76 |
| Sales division—Expense account | 72,581.73 |
| Sales division—Special account | 258,534.82 |
| Import division—Special account | 165,631.53 |
| Import division—Regular account | 852,632.74 |
| Total | 1,467,283.58 |

Prior to August 1, 1947, accounts receivable due from and accounts payable due to Schoonmaker were kept current on a 30- to 45-day basis. Since that date and through 1954, payments were never made on specific invoices relating to the various purchases by petitioner of raw mica from Schoonmaker and the various sales of petitioner's fabricated mica by Schoonmaker. There were no due dates on any of the amounts owing between the two corporations. Schoonmaker made payments to petitioner on petitioner's accounts receivable on a periodic basis at intervals of a week to 10 days, usually in installments of $35,000 to $50,000.

Exact amounts paid by Schoonmaker depended upon and were limited to the funds needed by petitioner to meet its operating expenses, which were described and justified in detail in periodic fund requests by petitioner to Schoonmaker. Customers' remittances in payment for the sales of petitioner's fabricated mica through Schoonmaker were made to Schoonmaker, and as a result petitioner was dependent upon Schoonmaker for most of its funds. Blood, as chief administrative officer of both corporations, had final authority over the disposition of cash between them. It was his policy and practice to retain in Schoonmaker's New York bank account all of the funds of the two corporations other than amounts necessary to meet petitioner's minimum current operating requirements. Petitioner maintained only a nominal bank balance and at no time had sufficient funds, which would have had to have been transferred from Schoonmaker, to pay its accounts payable due to Schoonmaker.

Mica Company of Canada, hereafter referred to as MCC, is a wholly owned subsidiary of Schoonmaker. Since 1948, its facilities for the manufacture of mica plate have been located in a building subleased by petitioner at its Newport News, Virginia, plant site. MCC paid rent to petitioner, and used petitioner's accounting services, employment offices, and other services for which it became indebted to petitioner. The amount of this indebtedness was carried on petitioner's books during the years 1947 through 1954 as an account receivable. Petitioner used heat supplied by MCC for which it became indebted to the latter. This indebtedness was carried on petitioner's books as an account payable. On December 31, 1949, petitioner's account receivable due from MCC totaled $61,804.30 and its account payable due to MCC totaled $98,410.48. During the

1947–1949 period, one payment of $2,970.92 had been received by petitioner on this account receivable, and no payments had been made on the account payable. On March 31, 1950, the current balance due petitioner of $70,650.48 was applied against the contra-account payable due MCC, and a cash payment of $32,617.30 was made by petitioner which completely liquidated the account payable with the exception of $994.08. Thereafter the accounts with MCC were maintained on a substantially current basis.

Fabricantes en General S.A. de C.V., hereafter referred to as FEG, is a Mexican corporation which fabricates mica in a fashion similar to that used by petitioner. During the years 1947 through 1954, all the stock of FEG was owned by a partnership, Mica Importing Company, the membership of which consisted solely of the common stockholders of petitioner and Schoonmaker in interests proportionately equal to their stock interests. Substantially all the production of FEG was purchased by Schoonmaker which resold the same to its various customers. From time to time during the years 1947 through 1954 petitioner sold FEG various amounts of raw mica as well as items of machinery and equipment. Also from time to time during the same years petitioner would perform necessary finishing work on fabricated mica produced by FEG which did not meet customer's specifications. The amounts due from FEG as a result of the above transactions were carried on petitioner's books as an account receivable. At various times during the years 1947 through 1954 petitioner purchased fabricated or semifabricated parts from FEG. The amounts due to FEG as a result of these transactions were carried on petitioner's books as an account payable. On December 31, 1949, petitioner's account receivable due from FEG totaled $10,567.70 and its account payable due to FEG totaled $62,479.62. During the 1947–1949 period no payments had been received by petitioner on the account receivable; one payment of $47,610.04 had been paid on the account payable. Including one cash payment of approximately $102,000 recorded in 1951, the account receivable in 1954 totaled $127,802.14. Petitioner in 1950 paid in full its accounts payable to FEG and thereafter maintained that account on a current basis.

As of December 31, 1949, the balances on petitioner's books of the accounts receivable and accounts payable with the three related corporations totaled as follows:

|  | Accounts receivable | Accounts payable |
|---|---|---|
| Schoonmaker | $1,209,498.79 | $1,467,283.58 |
| FEG | 10,567.70 | 62,479.62 |
| MCC | 61,804.30 | 98,410.48 |
| Total | 1,281,870.79 | 1,628,173.68 |

During the period 1947 through 1954, petitioner sold ground and fabricated mica to customers other than those solicited by Schoonmaker and also purchased raw mica from suppliers other than Schoonmaker. The usual terms of sales in this category were 1 per cent discount if paid within 10 days with the full amount due in 30 days, and in respect to the purchases, "net 30 days." Both petitioner's accounts receivable and accounts payable in these cases were maintained on a substantially current basis.

Despite the common ownership of petitioner and Schoonmaker, the Brown family tended to identify petitioner with their family and Schoonmaker with Blood. There were at times differences of opinion as to the selling price and quality of the merchandise sold by Schoonmaker to petitioner.

Petitioner made additions to its facilities as a result of which its capacity for production or operation on the last day of its base period, December 31, 1949, was 200 per centum or more of its capacity for production or operation on the day prior to the beginning of such 36-month period, December 31, 1946, within the meaning of section 444(b)(1). Petitioner's industry classification under section 447(c) was manufacturing—stone, clay, and glass products—major group number 32, the industry base rate of return for which was 16.3.

For the purpose of determining its average base period net income under section 444(c) petitioner claimed "total assets" as of December 31, 1949, in the amount of $2,133,490.40. Included in said total were the full amounts of the accounts receivable due from Schoonmaker, MCC, and FEG, without reduction for the accounts payable to the same corporations. Respondent in his notice of deficiency made various adjustments to petitioner's computation of "total assets," but of the assets excluded in the course thereof petitioner disputes only the following reduction:

Debit accounts with related companies where a net liability existed:

| | |
|---|---:|
| Asheville-Schoonmaker Mica Co. | $1,209,498.79 |
| Fabricantes en General | 10,567.70 |
| Mica Company of Canada | 61,804.30 |
| Total | 1,281,870.79 |

Petitioner is entitled to an additional deduction for the year 1952 in the amount of $963.34 for State income taxes properly accruable during that year.

OPINION.

The question is whether petitioner's accounts receivable as of December 31, 1949, from three corporations owned by the same in-

dividuals who owned petitioner, to each of which petitioner was on the same date indebted in excess of the amounts due it from them, are includible in its "total assets" in computing its constructive average base period net income under section 444, I.R.C. 1939,[1] for purposes of the excess profits credit.

Section 444 provides for a substituted average base period net income upon which a taxpayer-corporation's excess profits credit may be computed in the event of an increase in the taxpayer's capacity for production or operation, as defined in subsection (b), during the base period. Subsection (c) provides in part:

(c) AVERAGE BASE PERIOD NET INCOME.—The average base period net income determined under this section shall be computed as follows:

(1) By multiplying the amount of the taxpayer's total assets for the last day of its taxable year immediately preceding its first taxable year under this subchapter by the base period rate of return, proclaimed by the Secretary under section 447, for the taxpayer's industry.

Subsection (g) refers to section 442(f) for the definition of "total assets" as used in this section.

Section 442(f) defines total assets as follows:

(f) TOTAL ASSETS.—For the purposes of this section, the taxpayer's total assets for any day shall be determined as of the end of such day and shall be an amount equal to the excess of—

(1) the sum of the cash and the property (other than cash, inadmissible assets, and loans to members of a controlled group as defined in section 435(f)(4)) held by the taxpayer in good faith for the purposes of the business, over

(2) the amount of any indebtedness (other than borrowed capital as defined in section 439(b)(1)) to a member of a controlled group (as defined in section 435(g)(6)) which includes the taxpayer.

Such property shall be included in an amount equal to its adjusted basis for determining gain upon sale or exchange, determined under the rules provided in section 441.

Respondent agrees that petitioner qualifies for the substituted average base period net income under section 444 and that petitioner is not a member of a controlled group as used in section 442(f), and there is no dispute as to the proper industry rate of return. However, respondent determined that the accounts receivable shown on the corporate books to be due petitioner from Schoonmaker, MCC, and FEG were not "property * * * held by the taxpayer in good faith for the purposes of the business" and were not includible in "total assets" within the meaning of section 444.

Petitioner contends that the statutory definition of "total assets" is clear and unambiguous and leaves no room for interpretation, that the accounts receivable are clearly property, that the separate

---

[1] All references are to the 1939 Code unless otherwise indicated.

accounts receivable and payable were created for justifiable business reasons and that all of the transactions reflected therein are bona fide and had a basis in fact, and were not merely bookkeeping entries without substance, and hence are held "for the purposes of the business"; and that the only offsetting indebtedness permitted by the law is indebtedness to members of a controlled group. Therefore, it is urged, in the absence of any showing of bad faith these receivables are includible in "total assets."

We do not agree with petitioner. The statutory language used in section 442(f), "property * * * held by the taxpayer in good faith for the purposes of the business," which is referred to in several other relief provisions of the excess profits tax law,[2] is the only check built into the statute to control the all-important single base from which several credits are computed, and appears to be a clear mandate to examine all assets in relation to the business giving rise to the profits subject to the tax.

Despite the fact that the above language is referred to several times in the law, neither the legislative history of the provision nor the regulations are of much assistance in deciding this question. However, a brief examination of the objectives of the excess profits tax and the purpose for this particular provision is helpful. We think what was said in *West Construction Co.*, 7 T.C. 974, referring to an excess profits credit granted under the World War II excess profits tax law, is equally applicable here, that "the fundamental purpose of the legislation * * * was to establish a measure by which the amount of profits which were 'excess' could be judged."

In the scheme of the law here involved, base period years were designated from which to determine normal profits but, recognizing that for various reasons the base period might not reflect normal income for a particular corporation during the excess profits tax years, Congress provided methods for computing substituted normal, or average base period, net income for such corporations. The method provided for this purpose where the need for adjustment was due to an increase in taxpayer's capacity during the base period years, as was the case with this petitioner, was to apply an industry rate of return to the taxpayer's total assets on the last day of the base period. Being based on an industry rate of return, it is implicit from the language used that Congress intended the rate of return to be applied to those assets held by the taxpayer on the critical date that would reasonably have been required for the conduct of that type of business. To apply the industry rate of return to all balance sheet figures, which might be grossly inflated simply

---

[2] E.g., secs. 443, 445, 459(d).

because of the taxpayer's method of bookkeeping, only because they qualify literally as assets normally used in a business of this type, would, if some of the figures were so inflated, provide the taxpayer using a substituted basis with a credit greater than that of the other taxpayers in the industry whose experience provided the normal rate of return. This was obviously not intended by Congress. Cf. *Adams Brothers Co.* v. *Commissioner*, 222 F. 2d 501 (C.A. 8), reversing on another ground 22 T.C. 395; *Hart-Bartlett-Sturtevant G. Co.* v. *Commissioner*, 182 F. 2d 153 (C.A. 8), affirming 12 T.C. 760; *Clearview Apartment Co.*, 25 T.C. 246; *West Construction Co.*, *supra*.

The evidence in this case indicates that the accounts receivable here in question were permitted to accumulate to unrealistic amounts, as were the offsetting liabilities to the same corporations, that these accounts were handled differently from petitioner's other trade accounts which were kept current, and that this was done primarily for internal control and information of the management. Few payments were made on any of the receivables or payables prior to 1950, except on the Schoonmaker sales division-regular account, and with one or two exceptions resulting from unusual circumstances, the balances in these accounts, both receivables and payables, either remained constant or increased consistently from the date of the functional realignment of the corporations in 1947 through 1954. While payments were received each year on the Schoonmaker sales division-regular account receivable, these payments were made not on the invoices rendered nor in the amount due at the time of payment, but rather by periodic payments of only such amounts as petitioner could show it needed for operating expenses at the time. The balance in this account had grown to over $1 million by the end of 1949 and over $4 million by the end of 1954.

Petitioner's controller testified that this was because of the policy adopted by the management to keep all money of both companies in New York. Such a policy would not have prevented depositing the money in an account in petitioner's name in a New York bank, but it is reasonable to assume that this was not and would never have been done until petitioner's indebtedness to Schoonmaker and the other corporations was paid off or substantially reduced. This witness also testified that he always considered these receivables to be valid collectible receivables and the payables to be valid liabilities which would have to be paid off, but he did not claim that all of the receivables would be available for use in petitioner's business prior to payment of the liabilities.

While there may not have been any specific agreement about offsetting Schoonmaker's liability to petitioner against petitioner's

liability to Schoonmaker, there can be little doubt that had an attempt been made to collect the receivables without payment of the liabilities Schoonmaker would have claimed an offset. Of course this was not likely to occur as long as the same individuals owned and controlled both corporations and directed the flow of money between them. Nonetheless, the continuing existence of these large accounts between the same parties would not be likely had the corporations been unrelated, and there is no evidence that such a practice was either normal or necessary in the conduct of petitioner's business.

The evidence as a whole indicates that the accounts receivable here involved did not actually represent money or property available for or intended to be used in petitioner's business but rather were merely figures appearing on petitioner's books and balance sheet as a result of the bookkeeping system adopted by the common owners of these related corporations for their own purposes rather than for the purposes of the corporations. Consequently they do not constitute property held by the petitioner in good faith for the purposes of its business within the meaning of section 442(f) and are not includible in petitioner's total assets for computing its constructive average base period net income under section 444.

We do not imply by our conclusion here that accounts receivable in normal amounts can never be included in a taxpayer's "total assets" for purposes of section 444 solely because the taxpayer is also indebted to its debtor, nor that receivables and payables between two corporations must be offset per se. Our conclusion is limited to holding that the obviously inflated and unrealistic receivables here involved may not serve as a basis for computing petitioner's excess profits credit under section 444 for the years involved and petitioner has not shown wherein respondent's determination on this issue was erroneous.

Because of the concession made by respondent,

*Decision will be entered under Rule 50.*