Sam FRANK, Jr., and Esther Frank, Willie L. McNatt and Helen C. McNatt, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17230.

United States Court of Appeals Eighth Circuit.

Aug. 6, 1963.

Rehearing Denied Sept. 9, 1963.

Ronald M. Mankoff, of Durant, Hobby & Mankoff, Dallas, Tex., for petitioners and Wentworth T. Durant, Dallas, Tex., on the brief.

Alec A. Pandaleon, Atty., Dept of Justice, Washington, D. C., for respondent and Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson, Joseph Kovner, Washington, D. C., on the brief.

Before SANBORN and BLACKMUN, Circuit Judges, and STEPHENSON, District Judge.

BLACKMUN, Circuit Judge.

The Commissioner determined deficiencies in the 1956 and 1957 federal income taxes of Sam Frank, Jr. and Willie L. McNatt (and their respective spouses). These deficiencies were attributable to determinations (1) that the taxpayers in acquiring shares of two insurance companies had received compensation and (2) that gains realized on the sale of shares of those corporations and reported as long term capital gains

were not entitled to that favorable tax treatment because (a) the taxpayers were dealers in securities and (b) they had not held the shares for more than six months. The taxpayers respectively petitioned the Tax Court for redeterminations and, upon a partially adverse decision there, have now brought the case to this court.

Judge Scott filed a detailed and lengthy opinion not reviewed by the full court and not officially reported. T.C. Memo 1962–99. She ruled in the taxpayers' favor on the compensation question. The Commissioner has taken no appeal on that issue and it is not before us. Helvering v. Pfeiffer, 302 U.S. 247, 250–251, 58 S.Ct. 159, 82 L.Ed. 231 (1937). On the capital asset aspect of the case Judge Scott ruled that the shares sold had not been held by the taxpayers for more than six months as required by § 1222(3) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1222 (3), with respect to long term capital gains. In view of this conclusion the court felt that it was not necessary to pass upon the Commissioner's contention that the shares sold were not capital assets anyway because they fell within the exclusionary language of § 1221(1) by having been held by the taxpayers "primarily for sale to customers in the ordinary course of * * * business".

*The facts.* The case was submitted on stipulated facts and accompanying documents. So far as those facts are pertinent here, they are:

a. McNatt was registered with the Texas State Securities Board as a general securities dealer from October 1954 until April 1956. Frank was so registered from February 1954 through 1955. The two were the principal partners of a Dallas partnership so registered in 1955. Frank was president and McNatt was vice-president of a corporation similarly registered in November 1955. On February 28, 1956, Frank and McNatt organized an Arkansas joint venture which terminated in January, 1958.

b. Sometime before the end of February 1956 Frank, representing himself and McNatt, met with officers and directors of Bankers Insurance Company, an Arkansas corporation, and advised them on methods of raising additional capital. The plan developed called for the application by Bankers for Arkansas authority to issue and offer 100,000 new shares at $1.50 per share and thereafter to seek authority for 200,000 more shares at $5.

c. Bankers and the taxpayers executed an agreement dated February 28, 1956. This recited that Bankers was "desirous of engaging agents to promote the sale of and sell" 100,000 shares of its stock. Bankers agreed to make that number of shares available to the taxpayers to be sold by them at $1.50 per share exclusively within Arkansas, to pay them 10¢ commission on each share sold, and to permit the taxpayers themselves to purchase 50,000 of the shares on a one-year instalment basis.

d. On March 7 the Arkansas Bank Department authorized Bankers to sell and offer for sale in Arkansas 100,000 shares of its stock at $1.50 per share.

e. On March 22 Frank executed and delivered to Bankers his promissory stock subscription instalment note for $35,000. This recited, among other things, that Frank subscribed for 25,000 shares of Bankers stock at $1.50 less the commission. A certificate for the shares was issued immediately in Frank's name, attached to the note, and held by Bankers. Bankers' ledger disclosed payments made by Frank through February 14, 1957, covering the full amount of that note. On December 17, 1956, and February 14, 1957, Bankers turned over certificates for 10,000 and 15,000 shares, respectively, to Frank. Identical steps were taken by McNatt and on the same dates Bankers turned over to him certificates for 10,000 and 15,000 shares.

f. Also on March 22 McNatt and Frank jointly executed and delivered to Bankers their promissory note for $14,000. On March 28 a certificate for 10,000 shares of Bankers stock was issued in both their names, attached to this note, and held by Bankers. Bankers'

ledger disclosed payments made thereafter by Frank and McNatt through July 26, 1956, for the full amount of the note. On that date Bankers turned over 5,000 of those shares to Frank and 5,000 to McNatt.

g. On February 28, 1956, National Security Corp. was organized under Arkansas law. Frank was president and McNatt was vice-president. Each owned 49% of National's stock. From April 7, 1956, through 1957 Frank and McNatt devoted substantially all their time to the management of National. The balance of their time was devoted to the management of their private investments.

h. Also on February 28 Bankers and National executed an agreement whereby Bankers retained National as its exclusive agent to sell the 200,000 additional shares of Bankers by public offering. On April 2 National received an Arkansas permit to deal in and sell securities qualified under Arkansas law.

i. On March 29 Bankers received authority from Arkansas to issue the additional 200,000 shares of its stock and to offer it to the public at $5 per share. This certificate was later twice amended to increase the per share sale price on reduced numbers of shares.

j. Peoples Indemnity Insurance Company of Conway, Arkansas, was organized as an Arkansas corporation in October 1956 by the son of the president of Bankers. It had $50,000 authorized capital consisting of 250,000 no par shares.

k. Essentially the same steps followed with respect to Peoples as had taken place with Bankers. Frank and McNatt met with officers and directors of Peoples and advised them on methods of raising capital. Peoples and the taxpayers executed an agreement on November 2, 1956. By this contract Peoples agreed to make its 250,000 original shares available to the taxpayers to be sold by them at 50¢ a share exclusively within Arkansas, to pay them 10¢ commission on each share sold, and to allow the taxpayers themselves to purchase 100,000 of the

shares on a one-year instalment basis. On November 27 Arkansas authorized Peoples to sell and offer for sale in the state its 250,000 shares of capital stock at 50¢ a share. On the same date Frank executed and delivered to Peoples his stock subscription note for $24,750. This recited that he subscribed for 50,000 shares at 50¢ per share. The stock was issued, attached to the note, and held by Peoples. The corporation's ledger showed subsequent payments in full on the note. Between July 29 and November 30, 1957, Peoples turned certificates for these shares over to Frank. McNatt did the same thing and between the same dates he also received certificates for 50,000 shares of Peoples stock.

l. Peoples' Arkansas permit was amended on February 18, 1957, to permit the sale of 350,000 shares at 50¢. On April 4 Peoples was authorized to offer 100,000 shares at $3 each.

m. On March 6, 1957, Peoples and National executed an agreement whereby Peoples retained National as its exclusive agent for five years to sell the 100,000 additional shares of Peoples by public offering.

n. National maintained regular offices, employed over 20 salesmen, and represented itself to the public as a security dealer. McNatt did not have a license to sell securities in Arkansas. The Arkansas Banking Department, however, on March 7, 1956, issued a certificate of authority designating Frank as an agent of Bankers for the sale of its stock. As officers of National, a licensed dealer, Frank and McNatt were authorized to sell securities in that corporation's name in Arkansas.

o. After March 27, 1956, and April 4, 1957, National sold Bankers and Peoples stocks, respectively, at prices in excess of those at which the taxpayers had acquired their stock in these companies.

p. All the Bankers and Peoples shares sold by Frank, McNatt, and their joint venture were sold by National except some stock repossessed and sold through

brokers other than National. Subsequent to August 28, 1956, for Bankers, and to May 2, 1957, for Peoples, McNatt, as National's vice-president, allocated purchase orders received between the selling corporation and McNatt, Frank, and others. No allocation of an order to the account of Frank and McNatt was made until after six months from the dates of Frank's and McNatt's respective contracts with Bankers and Peoples.

q. National's federal income tax returns for its fiscal years ended March 31 in 1957 and 1958 showed no compensation paid to officers.

r. In their 1956 and 1957 returns the taxpayers reported the gains realized, individually and through the joint venture, on their sales of Bankers and Peoples stocks. The acquisition date of Bankers shares was specified as either February 28, 1956, the date of the agreement with Bankers, or March 22, 1956, the date of the notes. The acquisition date of Peoples shares was designated as November 2, 1956, the date of the agreement with Peoples. Sales consummated within six months after those dates were treated as short term capital transactions; those consummated more than six months after those dates were reported as long term capital transactions.

It is this long term treatment, with consequent tax benefit, which is challenged by the Commissioner.

■ *The extent of the Tax Court's ruling.* We are met at the outset with the suggestion on the part of the taxpayers that the Tax Court's decision as to the holding period necessarily included a determination on its part that the Bankers and Peoples shares in the hands of the taxpayers and their joint venture were capital assets and that, inasmuch as the Commissioner had taken no cross-appeal, he may not now argue that the shares are outside the statute's definition of capital assets.

It is true that the Tax Court at the end of its opinion did state, "We therefore sustain respondent in his contention that the gains * * * constituted short-term capital gain * * *", and thus employed capital asset language. But this does not equate with a definitive and exclusory holding that the shares were capital assets. When one reads the record and the Tax Court opinion in their entirety, it is indisputably clear that the short term issue was only an alternative ground urged by the Commissioner, that this was recognized by the taxpayers, and that the Tax Court itself so regarded it. The holding therefore was not to the effect that the shares were capital assets but was only that if they were such assets they still had not been held for more than six months.

*The holding period issue.* The resolution of this issue depends upon a determination as to when the taxpayers "acquired" the shares. McFeely v. Commissioner, 296 U.S. 102, 107–108, 56 S. Ct. 54, 80 L.Ed. 83 (1935). The Tax Court, in concluding that these taxpayers did not effect this acquisition when they delivered their respective stock subscription notes but, instead, only when certificates were turned over to them by Bankers and by Peoples, based this conclusion largely on its earlier holding in George W. S. Swenson, 37 T. C. 124 (1961), then pending on appeal here. This court, however, thereafter reversed that case. Swenson v. Commissioner, 309 F.2d 672 (8 Cir., 1962). While the Swenson facts and those presently before us are not fully identical, that reversal certainly casts doubt upon the Tax Court's decision on the holding period issue in this case.

Before the taxpayers may prevail, however, they must sustain the burden of showing that the shares in question were capital assets in the first place. If they were not, the period during which they were held by the taxpayers is of no consequence, for the beneficial long term capital gain provisions of §§ 1201(b), 1202, and 1222(3) have application only to capital assets. We therefore pass the holding period question for the moment and move on to the fundamental issue.

*Our power to pass upon the capital asset issue.* This, however, immediately raises the question whether this court may determine the capital asset issue when the Tax Court found it unnecessary to do so or whether we must remand the case for an initial resolution of that issue by the Tax Court.

■ This court has the power to sustain a decision of the Tax Court on a ground presented there even though that court rested its own conclusion on another ground not sustained on appeal. Helvering v. Gowran, 302 U.S. 238, 245–246, 58 S.Ct. 154, 82 L.Ed. 224 (1937); Cochran's Estate v. Commissioner, 173 F.2d 504, 505 (8 Cir., 1949); Boe v. Commissioner, 307 F.2d 339, 342 (9 Cir., 1962). See Jaffke v. Dunham, 352 U.S. 280, 281, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957); Aetna Ins. Co. v. Eisenberg, 294 F.2d 301, 308 (8 Cir., 1961). Furthermore, the capital asset issue was argued to the Tax Court and has been briefed and argued here. The taxpayers' opposition to our consideration of it, expressed in their initial brief and suggested in oral argument, seems now to have been withdrawn by a statement in their supplemental brief filed with our consent since the argument. The situation therefore is akin to that presented in United States v. Bess, 357 U.S. 51, 54–55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958), where the Court said:

> "But the essential facts pertinent to a decision on the merits of the * * * theory were stipulated in the District Court. Moreover, the issue was fully briefed and argued both in the Court of Appeals and in this Court. We therefore see no basis for any inference of prejudice in the circumstances, and accordingly proceed to a determination of the question,"

and is that described in Adams Bros. Co. v. Commissioner, 222 F.2d 501, 507 (8 Cir., 1955), where we said:

> "Although the question was there raised, the Tax Court did not reach this issue for decision. It is sub-

mitted to us upon this record. Both parties brief the question. Under those circumstances, it will be determined."

See also Seufert Bros. Co. v. Lucas, 44 F.2d 528, 530 (9 Cir., 1930). We therefore may and do proceed to a direct determination here of the capital asset question.

*The capital asset issue.* Section 1221 broadly defines the term "capital asset" to mean "property held by the taxpayer" but it excludes from that definition certain types of property among which is that "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". A second statute, § 1236(a), is also suggested by the Commissioner and at least is of interest. This provides that gain "by a dealer in securities from the sale * * of any security shall in no event be considered as gain from the sale * * * of a capital asset unless" certain conditions are fulfilled. There is no dispute here if the taxpayers were dealers in the stocks of Bankers and Peoples, the satisfaction of one of the exempting conditions has not been established by proof.

■ We have observed before that in these ordinary income-capital asset situations "each case must be determined upon its particular facts, and * * * no definite formula for deciding cases of this type can be prescribed". Greenspon v. Commissioner, 229 F.2d 947, 951 (8 Cir., 1956). It has been said that no fixed formula exists for resolving the issue; that no one factor is necessarily decisive, and that "a congeries of factors is to be considered and weighed". Tidwell v. Commissioner, 298 F.2d 864, 866 (4 Cir., 1962); Lockhart v. Commissioner, 258 F.2d 343, 347 (3 Cir., 1958). We also have in mind that the phrase "capital asset" in § 1221 is to be narrowly applied; that its exclusions are to be interpreted broadly; and that every day operations of a business are directed to ordinary income or loss rather than to capital gain or loss. Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29 (1955);

Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 265, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S. Ct. 1497, 4 L.Ed.2d 1617 (1960):

█ In the light of these principles we conclude that the taxpayers, with respect to their Bankers and Peoples shares, were engaged in the business of selling those stocks "in the sense that term usually implies", Dillon v. Commissioner, 213 F.2d 218, 220 (8 Cir., 1954); Yunker v. Commissioner, 256 F.2d 130, 133 (6 Cir., 1958); that the shares upon which they realized the gains in question were held by them primarily for sale to customers in the ordinary course of that business; and that those gains were not entitled to the benefit of capital asset treatment. We reach this conclusion because of the presence of the following factors in the aggregate:

1. The taxpayers' dealership background revealed by the dealers registrations in Texas in 1954 and 1955 of themselves, of their partnership, and of a corporation of which they were the principal officers.

2. The purpose of the retention of the taxpayers by Bankers and Peoples. Representatives of these corporations conferred with the taxpayers and sought their advice as to methods of raising capital. The taxpayers were experienced and knowledgeable in this field. They devised a plan for each corporation. Those plans were accepted and acted upon.

3. The taxpayers' involvement in the public sales. Part of the stated consideration for the taxpayers' services to Bankers and to Peoples was the granting to them individually of rights to purchase substantial portions (50% initially and 20% ultimately of Bankers; 40% initially and over 28% ultimately of Peoples) of the shares authorized for public offering. Frank received an Arkansas certificate of authority designating him as an agent of Bankers for the sale of its stock.

4. The effect of the taxpayers' efforts. They succeeded in creating a market and at authorized prices substantially in excess of what they paid for the stocks under the subscription agreement.

5. National's posture. National was a securities dealer. It was organized at the time the conversations with Bankers were taking place. It received authority to deal in securities qualified under Arkansas law and it renewed that authority. It was retained as agent to sell shares of Bankers and Peoples.

6. The taxpayers' relationship to National. National was a corporation officered and, for all practical purposes, wholly owned by the taxpayers. They, as National's officers, had authority to sell and did sell securities in National's name in Arkansas. Ark.Stats. § 67-1229 (since repealed and replaced by Acts 1959, No. 254). After National was licensed the taxpayers devoted substantially all their time to its management; nevertheless they received no compensation from the corporation.

7. The sales pattern. In the market so created shares sold by National were not restricted to those it was handling for Bankers and for Peoples through the exclusive agencies established by the agreements. While National was soliciting sales, the taxpayers were placing the shares they held with National for sale. The sales were allocated by McNatt among the selling corporation, the taxpayers, and their joint venture.

Although certain of these factors, as, for example, the earlier Texas dealership registrations, would not, standing alone, necessarily sustain our conclusion, all the facts in the aggregate compellingly lead us to a conviction that these taxpayers, with respect to the Bankers and Peoples stock during the taxable years in question, were in the securities business; that the Bankers and Peoples shares sold by them were held primarily for sale to customers in the ordinary course of business within § 1221(1); and that capital asset status was consequently not avail-

able. Cf. Tomlinson v. Dwelle, 318 F.2d 60 (5 Cir., 1963).

The taxpayers' opposing arguments do not persuade us. They are:

1. The intervening presence and posture of National. The argument here is that National is a separate entity, actually and for income tax purposes, that its presence is not to be ignored, and that its activities cannot be imputed to Frank and McNatt. The taxpayers assert that they were not the sole or even the major customers of National; that National's business was a bona fide commercial activity; that it earned commissions, filed returns, and paid its own income taxes; that it dealt with the taxpayers just as it did with its other clients; and that some stock repossessed by the taxpayers was not sold through National.

■■ As the petitioners urge, a corporation is usually regarded for tax purposes as an entity separate and distinct from its shareholders. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438–439, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949); Greenspon v. Commissioner, supra, p. 951 of 229 F.2d There are, however, recognized exceptions. See Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). It has been said, too, that the fact of existence of a corporation does not make it the agent of its shareholders. Moline Properties, Inc. v. Commissioner, supra, p. 440 of 319 U.S., p. 1134 of 63 S.Ct. Such agency is a separate question. National Carbide Corp. v. Commissioner, supra, pp. 437–438 of 336 U.S., p. 734 of 69 S.Ct.

■ These principles are, of course, to be accepted. National may be regarded as a bona fide corporation and its commission income as properly taxable to it. But the gains on the sales of the taxpayers' shares of Bankers and Peoples are what are involved here. It is not a question of taxing these gains to National or of National's income being taxed to

Frank and McNatt. It is a question, instead, whether National was acting as agent for the taxpayers in business activity and whether National's presence isolates the sales from that activity. A taxpayer may engage in business through an agent. When he does so, the acts of that agent will be imputed to the taxpayer and the presence of the agent does not isolate the taxpayer from the agent's activity. Kaltreider v. Commissioner, 255 F.2d 833, 838 (3 Cir., 1958); Bauschard v. Commissioner, 279 F.2d 115, 118 (6 Cir., 1960); Achong v. Commissioner, 246 F.2d 445, 447 (9 Cir., 1957); Estate of Mundy, 36 T.C. 703, 712 (1961). We think that such isolation was not effected here; that this is an agency situation; and that, under the circumstances of this case, National's existence does not convert what would be ordinary income to the taxpayers into capital gains.

2. The absence of customers. It is urged that "to customers" are the critical words in the exclusionary language of §. 1221(1); that they were specially inserted with § 117(b) of the Revenue Act of 1934 (compare § 101(c) (8) of the 1932 Act) in order to take away the benefit of ordinary loss deductions (the opposite side of the coin from that with which we are here concerned) from taxpayers who sold securities through brokers or dealers; that as a consequence the customer language has received different and far less critical interpretation in real estate cases than in securities cases; and that securities sales through a broker, agent, or dealer are not sales to customers of the seller.

The argument is intriguing but we feel it has no valid application to the facts, before us. It has been said that, in contrast to the real estate situation, a sale on a securities exchange is not usually considered to be a sale "to customers". Thomas E. Wood, 16 T.C. 213, 220 (1951); George R. Kemon, 16 T.C. 1026, 1032 (1951). The Kemon case is particularly stressed by both parties here. There the Tax Court, pp. 1032–1033 of 16 T.C., drew the distinction between a se-

curities dealer who was in business and had customers and a trader who might well be in business but who was to be regarded as having no customers. Even though the taxpayer in the Kemon case was held to be a trader rather than a dealer and even though his transactions were more numerous than those of the present taxpayers, we do not regard the Kemon case as one which prompts us to conclude that the activities of Frank and McNatt conformed to "the customary activity of a trader in securities rather than that of a dealer holding securities primarily for sale to customers", p. 1034 of 16 T.C. What is critical, we think, is that the facts in the present case disclose what is essentially "remuneration for their labors as a middleman bringing together buyer and seller and performing the usual services of retailer or wholesaler of goods".

3. The taxpayers' self-characterization as traders or speculators. This is supplementary to the preceding point. What is emphasized are the claimed comparative infrequency of purchases and sales, the profits realized, the intervals between acquisitions and sales, and the types of stocks involved. Although certain of these factors have been seized upon by the courts as significant in individual cases (see, for example, Rollingwood Corp. v. Commissioner, 190 F.2d 263, 266 (9 Cir., 1951) and Williamson v. Commissioner, 201 F.2d 564, 567 (4 Cir., 1953), cert. denied 345 U.S. 970, 73 S.Ct. 1112, 97 L.Ed. 1387), we find nothing of convincing pertinence in details of this type in this case.

We therefore readily conclude that, under all the circumstances presented here, Frank and McNatt were not entitled to the desired capital asset benefits for their taxable years 1956 and 1957.

This accordingly makes it unnecessary for us to pass directly on the holding period issue or on the additional suggestion raised by the Commissioner that these taxpayers were dealers within the meaning of § 1236(a).

Affirmed.