Estate of Clinton C. Millett, Deceased, The Omaha National Bank, Executor, and Martha S. Millett v. Commissioner.
Estate of Millett v. Commissioner
Docket No. 2060-62.
United States Tax Court
T.C. Memo 1964-159; 1964 Tax Ct. Memo LEXIS 176; 23 T.C.M. (CCH) 945; T.C.M. (RIA) 64159; June 9, 1964
*176 Taxpayers held real estate for sale to customers in the ordinary course of their trade or business in 1958 and 1959, but not in 1957. Gains on 1958 and 1959 sales are ordinary income; 1957 sales result in capital gains. Keith Miller, Omaha National Bank Bldg., Omaha, Neb., for the petitioners. Walter O. Johnson, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioners' income taxes of $1,927.29 for 1957, $8,170.12 for 1958, and $2,581.79 for 1959. The only issue remaining to be decided is whether real estate lots sold in 1957, 1958, and 1959 were held by the petitioners primarily for sale to customers in the ordinary course of their trade or business. Findings of Fact Clinton C. Millett and Martha S. Millett, husband and wife, filed joint income tax returns for 1957, 1958, and 1959 with the district director of internal revenue for Nebraska. Clinton C. Millett, hereinafter sometimes referred to as "decedent," died on January 31, 1964, and The Omaha National Bank was appointed executor of his estate. By order of this Court dated April 15, 1964, Estate of Clinton C. Millett, Deceased, *177 The Omaha National Bank, Executor, was substituted as party petitioner in place of Clinton C. Millett. Martha S. Millett, hereinafter sometimes referred to as "Martha," was and remains a petitioner in her own right. Decedent and Martha hereinafter will sometimes be referred to as "petitioners." On December 4, 1941, Martha purchased for $7,500 approximately 50 acres [1] of farm land in Douglas County, Nebraska. Title to this property was taken in the names of Clinton C. Millett and Martha S. Millett, husband and wife, as joint tenants. The tract was located approximately one mile north and five miles west of the most western growth of Omaha, Nebraska, in 1941. In 1946 petitioners constructed a home on the northwest corner of their farm land. They lived in this home from 1947 until February 1961. In 1938 decedent entered into the general practice of medicine in Omaha. He continued *178 in practice until 1942, when he entered military service. In 1945 decedent was discharged from service and resumed the general practice of medicine in Omaha. From 1946 until 1952, decedent was a member of the medical partnership "Drs. Hughes, Millett, Bucholz and Root," with offices in downtown Omaha. Since that time, the partnership has constructed its own building and has grown to the extent that, at the time of the trial herein, it had twenty-two physicians associated with it. From 1952 until the trial of this case, decedent was one of the senior managing partners of the partnership, known as "The Physicians Clinic." The growth of this partnership resulted largely from decedent's efforts. Decedent's income from his medical practice during the three years before us was: 1957 - $25,559.63; 1958 - $22,916.40 During the years before us, decedent, in addition to his work in The Physicians Clinic, was chairman of the General Practice Department of the Methodist Hospital of Omaha, chairman of the Out-Patient Department of the same hospital, a volunteer faculty member at the University of Nebraska College of Medicine and chairman of several committees for the Omaha-Douglas County Medical *179 Society. He also instituted loan funds for medical students. From 1941 to 1957 the land involved here was farmed either by tenant farmers or by neighbors. The old farmhouse, from time to time, was occupied by a tenant. Crops raised on the farm included corn, alfalfa, and pasture grass. In early 1957, there was residential development of Omaha property within one mile of petitioners' property. The property to the south of the farm had already been partly platted. Petitioners determined that they wanted to continue to live in the area and wanted to control the development of their neighborhood. In 1956 or early 1957, petitioners commenced preliminary planning relative to subdividing their land. During the preliminary stages of subdividing their property, meetings were held with a member of the Leo A. Daly Company, a firm of architects and engineers located in Omaha, Nebraska, engaged by petitioners for this purpose. As a result of these meetings, sketches of proposed plats were submitted to petitioners for approval. In 1957, approximately half of petitioners' farm was platted and subdivided as Clin-Mar Estates, consisting of 28 lots. A plat was recorded in the Register of Deeds *180 Office in Douglas County, Nebraska, on December 19, 1957. The southernmost third of the remaining property was sold to a developer. The remainder was kept as a park. On November 5, 1957, decedent executed an agreement with Metropolitan Utilities District of Omaha, Nebraska, for a sixinch water main to service Clin-Mar Estates. The cost of this improvement was $8,150. On May 9, 1958, decedent executed a contract with Peter Kiewit Sons' Company, Omaha, Nebraska, for the construction of pavement and storm drains for Clin-Mar Estates. The contract price was $25,000. The actual amount paid under this contract was $23,499.04. When decedent initially decided to subdivide and plat the involved portion of the farm, he had not planned to have gas lines installed in the subdivision. However, a representative of Metropolitan Utilities District contacted him and pointed out that Metropolitan Utilities District planned to run a gas line to another subdivision north and west of Clin-Mar Estates, and suggested that decedent should participate in this extension of the gas line and have it run to his subdivision. On August 13, 1958, the petitioner executed two agreements with Metropolitan Utilities *181 District of Omaha, Nebraska, for the installation of two gas mains to service Clin-Mar Estates. The cost of one installation, a four-inch main, was $6,218. The cost of the other, a two-inch main, was $2,900. On June 3, 1960, petitioners executed an underground service agreement with the Omaha Public Power District to install underground electric service facilities for Lots 14 through 22 at a charge of $1,968. During the years before us, the subdivision had no sewer system. In 1957, decedent engaged Lloyd M. Peterson (hereinafter sometimes referred to as "Peterson"), an Omaha real estate agent, to sell lots in Clin-Mar Estates. The lots have ever since been listed with Peterson except for a period from November 1958 to May 1959, at which time they were listed with John M. Jenkins, hereinafter sometimes referred to as "Jenkins." In an effort to sell the lots, Peterson posted signs, ran an ad in the local newspaper at least once a week, and talked to potential customers. Inquiries were received relative to the sale of lots. Jenkins posted signs on the property, ran weekly ads in the Omaha World Herald, and gave a listing of the property to his five salesmen. Quite a few inquiries *182 were received and the property was shown to prospective purchasers. No sales were made by the real estate agents. Petitioners, in the years 1957 through 1959, made six sales involving twelve lots from Clin-Mar Estates, as follows: Cost of
Improvements
Lot
Sale
Assumed by
Date
No.
Purchaser
Price
Purchaser
12-28-57
8
Bay
$ 4,000
$1,463.55
12-28-57
16
19
20
Armstrong
20,000
5,854.20
21
3-20-58
27
Kizer
5,500
1,463.55
11- 4-58
3
4
5
Walling
15,000
6
4-23-59
13
Gilbreath
6,500
5-19-59
2
Schmidman
9,000
$60,000
$8,781.30
Basis to Petitioners
Gain
Date
Land
Improvements
Realized
12-28-57
$ 150
$ 720.24
$ 3,129.76
12-28-57
600
2,779.20
16,620.80
3-20-58
150
720.16
4,629.84
11- 4-58
400
2,887.28
11,712.72
4-23-59
150
2,183.71
4,166.29
5-19-59
100
872.75
8,027.25
$1,550
$10,163.34
$48,286.66
Bay, Armstrong, Walling, and Gilbreath were old friends of decedent. Kizer heard of the development from one of decedent's partners. Kizer subsequently joined decedent's medical partnership. Schmidman was introduced to decedent *183 by a realtor other than Peterson or Jenkins. Decedent paid a commission on the sale to Schmidman, but not on any of the other sales listed above. Decedent and Armstrong agreed that if Armstrong still owned three lots three years after his purchase and wanted to resell them, decedent would repurchase them. The Armstrong and Gilbreath sales were on the installment basis; the others were for cash. The cost of the survey and installation of water and gas mains, paved streets, and storm drains during the years before us was as follows: Year
Amount
1957
$15,157.96
1958
35,906.82
1959
None Of the total expenditures, $42,283.48 was paid by petitioners and $8,781.30 [2] was assumed and paid by purchasers as indicated above. In 1961, petitioners sold their home on Lot 1, Clin-Mar Estates, and constructed a new home on Lot 15 of their subdivision. Decedent never held a license to sell real estate. Decedent made no attempt to sell the property as a single unit. Petitioners did not hold the Clin-Mar Estates lots primarily for *184 sale to customers in the ordinary course of their trade or business in 1957; they did in 1958 and 1959. Opinion Petitioners maintain that the lots they sold in Clin-Mar Estates were capital assets, the gains from which are to be taxed at capital gain rates. Respondent maintains that these assets are not capital assets under section 1221(1) of the Internal Revenue Code of 1954[3] because the lots were held for sale to customers in the ordinary course of the taxpayers' trade or business. The parties agree that petitioners' original purpose and activities regarding the tract of land they purchased in 1941 did not involve their participation in a trade or business in which they were holding real estate for sale. The dispute before us centers about whether (and if so, when) their activities with regard to these lots caused them to enter such a trade or business. [4]
*185 The statute does not define the phrase "trade or business" and so we must glean the meaning of that term, as applicable to the facts of this case, from other sources. We are mindful that the capital gain provisions, being an exception from the normal tax rates, are to be construed narrowly ( Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955)); that these provisions were adopted to relieve taxpayers from the burden of high graduated rates imposed upon gains which were realized within a given tax year but which resulted from gradual appreciation over a long period of time ( Burnet v. Harmel, 287 U.S. 103, 106 (1932)); and that the statutory provision here involved is intended to distinguish between those situations where the taxpayer's profit is expected to arise merely from appreciation over a period of time and those in which it arises from the taxpayer's activity with regard to the property. George R. Kemon, 16 T.C. 1026, 1032-33 (1951); Frank v. Commissioner, 321 F. 2d 143, 151 (C.A. 8, 1963); Galena Oaks Corporation v. Scofield, 218 F. 2d 217, 220 (C.A. 5, 1954). The facts before us do not clearly lead *186 to a conclusion for either side. Those pointing toward the taxpayers' position include the following: the property was purchased approximately 16 years before it was subdivided; we have no evidence of other real estate dealings by the petitioners; only six sales were made during the three years before us; decedent was a "full time" physician and devoted substantial additional time to other activities not related to this property or its sale. Facts pointing toward the respondent's position include the following: petitioners made no effort to dispose of the property before developing it; petitioners were not required to sell some of the lots in order to maintain their investment in the remainder; petitioners' development activities involved total expenditures many times what they originally spent for the lots; their development activities were quite extensive and clearly looked forward to profits being derived from the sale of lots; through the real estate agents they employed, petitioners engaged in just the activities that would be expected of one in the trade or business of developing and selling real estate. Petitioners state on brief that "Profits inured to [them] solely because *187 the City of Omaha grew to and enveloped their farm, changing the landscape from rural to suburban." We know from the record that in 1941 residential outskirts were somewhat more than five miles from petitioners' property and that 16 years later residential outskirts had advanced to approximately one mile from their property. The record is devoid of any indication as to the extent to which petitioners' gains here at issue were derived from such residential movement or changes in price levels generally rather than from petitioners' development and sales efforts. We note that during 1957 petitioners' activities included subdividing the property and entering into an agreement to provide a source of municipal water to the property. Petitioners' net expenditures in these activities amounted to less than $8,000. The great bulk of their expenditures and a large part of their development activities took place in 1958. Their sales activities continued through 1959, when they also were in the position of benefiting from the development activities and expenditures of the prior years. On the basis of the record before us, we conclude that, during 1957, petitioners were not holding their lots *188 in Clin-Mar Estates for sale to customers in the ordinary course of their trade or business. We conclude further that, during the early part of 1958 (before the first sale of lots in 1958) petitioners' relationship to the property had changed and that thereafter during the years before us, they were holding these lots for sale to customers in the ordinary course of their trade or business. Decision will be entered under Rule 50. Footnotes
1. The stipulation states that the area is approximately 52 acres. However, the deed indicates it is approximately 50 acres and describes the property as 1 1/4 quarter sections, which would approximate 50 acres. The dimensions shown on the plat also indicate the area to be almost exactly 50 acres.↩
2. The record indicates that the stipulated fisure, $8,741.30, is incorrect and the correct amount is that set forth in the findings.↩
3. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; ↩
4. Petitioners have accepted respondent's adjustments to basis for each of the lots sold. Respondent does not dispute the propriety of petitioners' election to treat the Armstrong and Gilbreath transactions as installment sales. These agreements, in addition to others disposing of issues raised in the pleadings, will be given effect in the Rule 50 computation.↩