GLENN E. MAGEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PHYLLIS M. MAGEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23221, 23222. Promulgated March 21, 1952.

*Oliver M. Jamison, Esq.*, for the petitioners.
*Edward H. Boyle, Esq.*, for the respondent.

## OPINION.

Van Fossan, *Judge:* The only issue for decision in these proceedings is stipulated to be whether the turkeys sold by petitioners in 1945 were property held by the taxpayers primarily for sale to customers in the ordinary course of their trade or business as defined by section 117 (j) of the Internal Revenue Code.[1]

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

 *          *          *          *          *          *          *

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable.

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *

It is the petitioners' position that the turkeys sold in 1945 were held for breeding, not for sale, having been retained for use as breeders instead of being sold in the fall of 1944. In contending that petitioners' turkeys were primarily held for sale to customers in the ordinary course of trade or business, the respondent points out that as turkeys have such short lives there can be no valid distinction between breeding and non-breeding stock. It is also urged by respondent that there can be little difference between breeding and non-breeding turkeys because of the single breeding season. An additional fact demonstrating the lack of distinction between breeding and non-breeding birds is said to be found in the sale of all the turkeys at the same price. Respondent argues that, tested as of the time of sale rather than at any previous time, the breeding turkeys were held for sale to slaughterers in the same manner as the annual sales of turkeys. So tested, respondent urges it is obvious that the birds were held primarily for sale to customers.

This Court has held that the sale of animals kept for breeding purposes results in capital gain under section 117 (j). *Franklin Flato*, 14 T. C. 1241; *William Wallace Greer, Jr.*, 17 T. C. 965. Animals have qualified as breeders although only a single offspring or litter was obtained before sale, if such was the customary trade practice. *Albright* v. *United States*, 173 F. 2d 339; *Isaac Emerson*, 12 T. C. 875. Where animals are sold after a single breeding season and there is no trade custom or practice to this effect, capital gain treatment has been denied. *Leonard C. Kline*, 15 T. C. 998.

The turkeys here involved were withheld from sale during the fall of 1944 and retained by petitioners to produce a new crop of eggs and poults. The turkeys were maintained throughout the winter months. Those unfit for breeding were culled out. After the new poults were hatched, the breeders were sold, as is the usual custom. The young turkeys ordinarily would be sold in the fall except for those birds retained for breeding purposes in the following year. The trade practice was to sell the breeders after one season because the birds became less productive and more expensive to maintain as they grew older. The non-breeding stock was sold in the same year that the birds were hatched.

Respondent errs in arguing that there is no distinction between breeding and non-breeding stock because of the short life of turkeys and their single breeding year. In terms of expenditure of time, money, and labor by the owner, the difference may be greater than is apparent. Breeding stock is not sold during the peak fall season when the demand for Thanksgiving and Christmas turkeys is greater. These birds must be fed during the winter. Breeding stock is damaged by fighting and breeding, and when sold, after the new poults are hatched, the demand for turkeys has ordinarily declined. Thus, there

may be a significant economic difference between breeding and non-breeding stock in the practical aspect of raising turkeys. The use of certain birds as breeders is not a temporary interlude before sale. When the birds were withheld from sale in the fall, the production of a new generation of turkeys in the spring became their principal purpose, one necessary to the continuation of petitioners' business. The sale of these birds after the poults are hatched is secondary to the successful production of the eggs and poults. This is true despite the fact that the price received for these turkeys is identical with that of the non-breeding stock sold during primary marketing season. Under the circumstances of the wartime meat shortage and the existing governmental ceiling prices, it is not of determinative significance that the older breeding turkeys were sold at the same price as the non-breeding stock.

The respondent misconceives the test in contending that the purpose for which the birds were held is determined only as of the time of sale. *McGah* v. *Commissioner*, 193 F. 2d 662. Tested by the purpose for which the turkeys were held during the taxable year, the crucial factor in determining the character of the property, *Carl Marks & Co.*, 12 T. C. 1196, we arrive at the conclusion that the property was not held primarily for sale to customers in the ordinary course of trade or business.

The facts in this case are in some respects unique. When their son died, the petitioners determined to abandon the business. The breeding stock was sold after sufficient poults were obtained to fill commitments. The birds in question here were sold as any breeding stock, when their usefulness as breeders came to an end. It is true that if the breeders were kept another year they would then have been of less value when sold but the main reason they were not kept for another year is because they had lost their value as breeders. The breeders were sold as they would have been in the normal course of petitioners' operations. The petitioners did not, however, retain any poults to sell in the fall or for use as future breeding stock, demonstrating their intention to quit the business. The turkeys sold by the petitioners in 1945 cannot, on the facts presented, be classified as respondent urges and his objection that the birds were primarily held for sale fails because of the fact that the birds were primarily held for breeding purposes.

The recent Revenue Act of 1951 enacted legislation which is pertinent to the issue involved herein. Section 324 of that Act provides, as follows:

SEC. 324. SALES OF LIVESTOCK.

Section 117 (j) (1) is hereby amended by adding at the end thereof the following new sentences: "Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for

12 months or more from the date of acquisition. Such term does not include poultry." The first sentence added to section 117 (j) (1) by the amendment made by this section shall be applicable with respect to taxable years beginning after December 31, 1941, except that the extension of the holding period from 6 to 12 months shall be applicable only with respect to taxable years beginning after December 31, 1950. The second sentence added to section 117 (j) (1) by the amendment made by this section shall be applicable only with respect to taxable years beginning after December 31, 1950.

The new statutory amendment provides that between January 1, 1942, and December 31, 1950, the term "property used in the trade or business" shall also include livestock held for draft, breeding, or dairy purposes for 6 months or more from the date of acquisition. After December 31, 1950, livestock must be held for 12 months or more and the term "property used in the trade or business" shall not include poultry after this latter date.

It can readily be seen that the new provision does not disturb the conclusion we have reached as to the sale of turkeys in 1945. If turkeys are included within the definition of livestock, the petitioners' breeding stock must also, of necessity, be included within the statutory definition of the term "property used in the trade or business." If turkeys are excluded from the definition of livestock, they are unaffected by section 324 of the new Act until January 1, 1951. Prior to that date poultry is neither expressly included nor excluded from section 117 (j) by the terms of the statute. We find nothing in prior case or statutory law to exclude poultry from capital gains treatment.

Numerous cases have considered the applicability of section 117 (j) to cattle and hogs. The sale of breeding cattle not held primarily for sale to customers in the ordinary course of business has been treated as a capital gain transaction in *United States* v. *Bennett*, 186 F. 2d 407; *James M. McDonald*, 17 T. C. 210; *Walter S. Fox*, 16 T. C. 854; *Franklin Flato, supra; Fawn Lake Ranch Co.*, 12 T. C. 1139. Hogs sold after use as breeders for one year were considered section 117 (j) property in *Davis* v. *United States*, 96 F. Supp. 785; *Retz* v. *Birmingham*, 98 F. Supp. 322. Cattle and hogs, held for breeding purposes, have been given similar treatment upon sale in *Albright* v. *United States, supra; Isaac Emerson, supra*. We see nothing inherent in the raising of turkeys to preclude the classification accorded to cattle and hogs if the requisites of section 117 (j) are otherwise met.

The respondent has, however, despite these decisions, taken the position that gains from the sale of dairy, draft, or breeding animals will be recognized within the purview of section 117 (j) only if the animals were actually used for dairy, draft, or breeding purposes for substantially their full period of usefulness. He cites Mim. 6660 (1951), I. R. B. 15, p. 3 [1951-2 C. B. 60], which provides:

* * * Gains derived from the sale of breeding animals which were used for the production of only one offspring or litter of offspring will not be subject to the capital gains treatment prescribed by section 117 (j) of the Code. Animals which are used only temporarily as breeders or producers, including ordinarily hogs, chickens, and turkeys, will not be subject to the capital gains treatment prescribed by section 117 (j) of the Code.

Respondent states that the retroactive application of the amendment was made by Congress to eliminate the confusion arising from the respondent's position and the decisions contrary thereto. Whether such is the result is not in question here. Our conclusion that petitioners' turkeys were not held primarily for sale is based upon the facts. The statute, as amended by the Revenue Act of 1951, does not compel the conclusion that turkeys cannot be property used in the trade or business as defined by section 117 (j).

*Decisions will be entered under Rule 50.*