CHARLES A. SYKES AND MARJORIE M. SYKES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7386–70. Filed February 15, 1972.

*Ralph J. Gines*, for the petitioners.
*Joe K. Gordon*, for the respondent.

DAWSON, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Taxable year | Amount |
|---|---|
| 1967 | $3,073.79 |
| 1968 | 9,751.91 |

Three issues are presented for decision. They are: (1) Whether petitioner Charles A. Sykes is entitled to capital gain treatment on the sale of raised alfalfa leafcutter bee larvae; (2) whether "breeder" bees qualify as "livestock" under section 1231(b)(3)(B), I.R.C. 1954;[1] and (3) whether petitioner is entitled to deduct in the year of purchase the cost of bee larvae purchased for resale or whether he must offset the cost against the sales price in the year of sale.

Petitioners amended their petition to raise the issue that they be allowed the benefits of income averaging under sections 1301 through 1305 for the years 1967 and 1968. Our decision with respect to the first issue will determine their entitlement to income averaging. The facts necessary for application of income averaging and a computation have been stipulated by the parties.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Charles A. and Marjorie M. Sykes (herein called petitioners) are husband and wife who resided in Nyssa, Oreg., when they filed their petition in this proceeding. They filed their joint Federal income tax returns for the years 1967 and 1968 with the district director of internal revenue at Boise, Idaho.

Charles A. Sykes (herein called petitioner), who is engaged in the business of farming, began raising alfalfa leafcutter bees as early as 1961. During 1967 and 1968 the petitioner spent about 80 percent of his time doing farm work and about 20 percent raising and selling leafcutter bees.

The following pertinent information about the alfalfa leafcutter bee appears in a publication dated August 1, 1967, issued by the Agricultural Extension Service, College of Agriculture, University of Idaho:

The alfalfa leafcutter bee is one of the important alfalfa pollinators in Idaho. This bee, a native of Europe and Asia, was first collected in the United States in Virginia in 1937. It steadily moved westward until it is now found in almost all states except the extreme south. It has been known in Idaho since 1955. However, the first large increase in population occurred in 1960 and its potential for pollinating alfalfa was recognized. In 1961, a phenomenal increase in population took place throughout most of the Boise Valley and the Lower Snake River alfalfa seed growing areas.

---

[1] All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

## NESTING HABITS AND BIOLOGY

This leafcutter bee normally nests in places that provide suitable holes for its cell construction, such as insect burrows in dead logs and limbs and cracks and crevices in wood and under bark. However, it has been observed to nest in such places as nail holes, air pockets in concrete structures and in cinder blocks under shingles and house siding.

The bees overwinter in silken cocoons inside their lead-lined cells as creamy white, ¼ inch long, full grown larvae. Shortly before emerging in June, the larvae change to pupae and soon emerge as adult bees. Upon emerging, each new female searches for nesting holes close to sources of food. Each nest is started with a cup or cell made of cut leaves and as soon as the cell is formed, the female visits alfalfa blossoms to collect pollen to provision the cell. She trips the flowers rapidly and scrapes the pollen with her front legs into the brush of hairs under her abdomen. Returning to the nest, she first enters it head first and then emerges and backs in to deposit the pollen. After the last load of pollen is deposited in the cell, she regurgitates a "pool" of alfalfa nector on the pollen mass and deposits a single egg. The female then seals the cell and starts the next one using the sealed end as the bottom. This process is repeated until the nesting hole is filled. Finally, the outer cell in each hole is sealed with a plug of leaves.

The egg hatches in 2 to 3 days and the larva consumes the pollen mass in its cell and becomes full grown within a week. Some of the larvae remain without further development until the following year before emerging as adults. However, many will continue through their life cycle and emerge as adults in about 28 to 35 days after the eggs are laid. These will produce a second generation, and under certain conditions, a few individuals may produce a third generation. The number of eggs laid per female during her lifetime is uncertain, but estimates range from 30 to 40. The ratio of males to females appears to be about one to one with the males usually occupying the outer cells in the nesting hole. Occasionally, bees that emerge from one nesting hole will all be of one sex. A greater percentage of males usually develop when the nesting holes are less than 2½ inches long.

Although male leafcutter bees occasionally will trip an alfalfa blossom, most of their time is spent near the nesting site or chasing and mating with females in the field. Unmated females will produce only males; mated females produce both females and males.

Males sometimes spend the night in or near the nests but often will remain in the field. The females, on the other hand, stay in their nests overnight, usually close to the entrance with their heads pointed inward.

Observations in Idaho indicate that alfalfa pollen is the primary source of food for alfalfa leafcutter bees. This is the principal reason for their great value in afalfa seed production. However, sweet clover is also an attractive pollen plant and other flowering plants, such as spikeweed, cosmos, golden rod, knotweeds, spurges and mallow are visited.

In Idaho, the leaves of alfalfa are the primary source of material for cell construction. However, leaves of knotweed, aster, and sweet clover, as well as flower petals of rose, petunia, and larkspur, dog fennel and other plants are occasionally used.

\*       \*       \*       \*       \*       \*       \*

## ARTIFICIAL NESTS

Many successful devices have been tried by researchers and growers to provide enticing artificial nests. Three-sixteenths inch holes drilled into wood and timber have probably been the most successful of all artificial nesting holes tried.

\*    \*    \*    \*    \*    \*    \*

The preferred type of leafcutter bee nest is prepared by stacking grooved boards in a box. Both ⅜ inch Particle Board and ⅜ inch fir plywood have been satisfactory in preparing the groove nesting boards. The grooves should be $7/32$ inch in diameter and 3 inches long. The finished holes in the stack groove boards should be free of slivers. The size of the box which snuggly holds the grooved boards will depend upon the size of the field domicles [sic] and the convenience in handling.

### PLACEMENT OF ARTIFICIAL NESTS

Present information indicates that 5,000 to 10,000 females (10 to 30,000 sound cells) are needed to adequately pollinate an acre of alfalfa for the production of 1,000 pounds of clean seed. Each field domicle [sic] should have at least twice the number of holes as compared to the number of cells placed in the trays. As the boxes of nesting holes become filled they should be removed and be replaced with additional boxes of grooved boards. Some growers are switching from small field domicles [sic] placed close together to large domicles [sic] with sufficient bees to pollinate 3 or more acres of alfalfa from one location.

Leafcutter bees may be raised by the use of a device known as a bee board. The board is about 3 inches thick, 6 inches wide, and 4 feet long. It contains approximately 2,000 holes.

The female leafcutter bee lays her eggs in the holes in the bee board. Each female leafcutter bee is capable of laying eggs. The female leafcutter bee has an average lifespan of from 35 to 40 days.

The economic use of the leafcutter bee is pollination. The bee is primarily used in Idaho in seed alfalfa production. Minimal pollination requirements for seed alfalfa are approximately 10 bee boards to the acre.

Petitioner began making large sales of leafcutter bee larvae in 1967 when he entered into an agreement with L & W Farms of Moses Lake, Wash., to provide 1 million filled holes of larvae per year for 3 years. During 1967 he sold 1 million holes, but during 1968 the purchaser requested the remaining 2 million.

In 1967 and 1968 some of the leafcutter bees were raised by petitioner and others were purchased for resale. Bee larvae raised and bee larvae purchased for resale each accounted for about one-half of petitioner's sales during 1967 and 1968.

Each winter the petitioner stored two groups of bees in refrigeration. One group had been sold or would be sold. The second group

was petitioner's so-called breeder stock. The breeder stock bees were not sold, but were used to produce new generations which were sold.

Leafcutter bee larvae are sold in the bee board. The method of selling the bees is "by the hole." During 1967 and 1968 leafcutter bees sold for 2 cents per hole. A full bee board of 2,000 holes would sell for $40.

During 1967 and 1968 the petitioner purchased empty bee boards at a price ranging from $3 to $3.50 per board. Once a bee board was sold by petitioner, it was not returned to him. The average useful life of a bee board is 3 years.

Almost all of petitioner's gross income during 1967 and 1968 came from the sale of leafcutter bee larvae.

Some leafcutter bee larvae purchased in 1967 were not sold until 1968 and some purchased in 1968 were not sold until 1969. Petitioner's yearend inventory from 1967 to 1968 was valued at $3,000. The carryover inventory of leafcutter bee larvae from 1968 to 1969 was also $3,000.

The method of determining the inventory was as accurate as possible under the circumstances.

During 1967 and 1968 the petitioner's method of accounting was cash receipts and disbursements.

During the 4 years preceding 1967 the petitioners had no taxable income and reported total capital gain net income of $5,476.07.

In their Federal income tax returns the petitioners reported $15,575 in 1967 and $38,595 in 1968 from the sale of "breeding stock—leafcutter bees" as long-term capital gains.

In his notice of deficiency dated August 27, 1970, respondent explained his adjustments as follows:

> (d) On Schedule D attached to your returns for years 1967 and 1968, you reported long-term capital gains in the respective amounts of $15,575.00 and $38,595.00 which were identified as "Breeding stock-Leaf cutter bees." It is held that these sales do not constitute long-term capital gains under Sections 1221 and 1231 of the Internal Revenue Code because they were held primarily for sale to customers in the ordinary course of your trade or business. It is further held that they do not qualify as livestock used in your trade or business within the intendment of Section 1231 of the Internal Revenue Code because they had not been held for the required 12 month holding period and you had not used them for breeding. Therefore, ordinary income for year 1967 is increased by the amount of $15,575.00, and ordinary income for year 1968 is increased in the amount of $38,595.00. The reported long-term capital gains are eliminated in Adj. (4) of this Statement.

> \*       \*       \*       \*       \*       \*       \*
> (f) It has been determined that you purchased bee larvae in both years 1967 and 1968 at an estimated cost of $3,000.00 which were held over until the following year for resale. It is held that these costs are allowable only in the year of

sale. Accordingly, $3,000.00 is disallowed in each year 1967 and 1968. However, the $3,000.00 disallowed in 1967 is an additional allowable deduction in 1968.

## ULTIMATE FINDINGS

1. Petitioner was engaged in the business of raising and selling leafcutter bees in 1967 and 1968.

2. The raised leafcutter bee larvae and bee boards were held in 1967 and 1968 primarily for sale to customers in the ordinary course of petitioner's business.

3. The "breeder stock" of leafcutter bees do not constitute "livestock."

4. Petitioner had carryover inventories of leafcutter bee larvae in the amount of $3,000 from 1967 to 1968 and $3,000 from 1968 to 1969.

## OPINION

1. *Gains from sale of raised leafcutter bee larvae and bee boards.*— The primary issue confronting us is whether the amounts received by the petitioner during the years 1967 and 1968 from the sale of raised bee larvae and boards should be taxed as ordinary income, as determined by respondent, or as long-term capital gains, as contended by petitioner. Its resolution depends on whether the property (bee larvae and boards) was held by petitioner "primarily for sale to customers in the ordinary course of his trade or business," so as to be excluded from the definition of a capital asset under section 1221(1) of the Code.[2]

Petitioner maintains that when he sold the bee larvae and boards they were held by him for investment and not for sale to customers in the ordinary course of his business; and that his activities with respect to the property were insufficient to constitute a trade or business. Respondent takes a contrary view, contending that the sales of the raised bee larvae and boards do not qualify under either section 1221 or section 1231.

In *Malat* v. *Riddell*, 383 U.S. 569, 572 (1966), the Supreme Court concluded with respect to section 1221(1):

The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * [citation omitted] and "the realization of apprecia-

---

[2] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or *property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;* [Emphasis added.]

tion in value accrued over a substantial period of time" on the other. * * * [citation omitted.] A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in § 1221(1), "primary" means "of first importance" or "principally."

Essentially the issue is factual. *Kelley* v. *Commissioner*, 281 F. 2d 527 (C.A. 9, 1960); *Pool* v. *Commissioner*, 251 F. 2d 233 (C.A. 9, 1957), certiorari denied 356 U.S. 938 (1958). The same issue under varying factual situations has been litigated numerous times and the courts have repeatedly emphasized that each case must be decided on its own facts. Certain factors have sometimes been recognized as helpful guides in reaching the correct result. Among them are: (1) The reason, purpose, and intent for which the property was acquired and held; (2) the frequency, continuity, size, and substantial nature of the transactions claimed to result in a trade or business; (3) the activities of the seller in connection with the handling and disposition of the property; and (4) the proximity of sale to purchase.

Equally important to a proper consideration of the issue is our recognition that the capital gain provisions, being an exception to the normal-tax rates, are to be construed narrowly, *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52 (1955); that these provisions were adopted to relieve taxpayers from the burden of high graduated rates imposed upon gains which were realized within a given tax year but which resulted from gradual appreciation over a long period of time, *Burnet* v. *Harmel*, 287 U.S. 103, 106 (1932); and that the statutory provision here involved is intended to distinguish between those situations where the taxpayer's profit is expected to arise merely from appreciation over a period of time and those in which it arises from the taxpayer's actions and activities with regard to the property. *George R. Kemon*, 16 T.C. 1026, 1032–1033 (1951); *Frank* v. *Commissioner*, 321 F. 2d 143, 151 (C.A. 8, 1963).

Since the answer must be determined from all the facts and circumstances present herein, we think it would serve no useful purpose to embark upon a detailed discussion and analysis of the facts contained in the many cases cited by both parties in their briefs. Suffice it to say that we have examined and considered them.

Applying these criteria and other considerations, we are convinced that the leafcutter bee larvae and boards were property held by petitioner *primarily* for sale to customers in the ordinary course of his business. It was through his efforts that the bee larvae were raised. The adult bees on his property laid eggs in the bee boards and it was

these larvae which the petitioner later sold for profit. Certainly the petitioner had an occupational undertaking which required the devotion of time, attention, or effort with substantial regularity.[3] He sold 1 million "holes" of bees in 1967 and 2 million "holes" in 1968. He received $15,575 in 1967 and $38,595 in 1968 from the sale of raised leafcutter bee larvae. Most of petitioner's income in these 2 years came from the sale of the bee larvae. In 1968 the petitioner installed a refrigeration unit and building at a cost of $3,836.50 for bee larvae storage.

Petitioner argues that since he spent only 20 percent of his time handling the leafcutter bee operation it was not a business. We cannot agree. It is clear that an individual or corporation can have more than one business. *Pennroad Corp.* v. *Commissioner*, 261 F. 2d 325 (C.A. 3, 1958). The mere fact that a person may spend more time on one business or on one aspect of his business than on another does not mean that his lesser effort is not to be treated as a business. Nor does the fact that nearly half of petitioner's sales in 1967 and 1968 were made to one customer preclude his being engaged in a business. *Patterson* v. *Belcher*, 302 F. 2d 289, 294 (C.A. 5, 1962).

Petitioner asserts that the bee boards were held over for a regeneration of his investment and not for sale to customers. Again we must disagree. The bee board produced nothing; any regeneration or increase was produced by the bees. The board is simply a container which is used for nesting by the bees. Moreover, the petitioner testified that once a board filled with bees is sold, the board is not returned. The boards are similar to disposable containers and, as such, are not subject to depreciation or capital gains treatment. Petitioner's method of sale was correctly based on the bee larvae.

Accordingly, on the basis of this record, we are led inexorably to the conclusion that the petitioner was engaged in the business of raising and selling leafcutter bee larvae in 1967 and 1968 and that the larvae were held by petitioner primarily for sale to customers in the ordinary course of his business. The amounts received are therefore not entitled to long-term capital gains treatment.

2. *"Breeder" bees.*—Alternatively, the petitioner contends that his "breeding stock" of leafcutter bees qualifies as "livestock" under sec-

---

[3] On direct examination the petitioner testified as follows:
Q. Now what business were you engaged in during 1967?
A. I was farming and also in the leaf cutter bee business.
Q. You are selling bee boards, bees, bee larvae. The same thing is true of 1968?
A. Right.
Q. What did you consider your occupation during those two years?
A. Farmer, and the leaf cutter bee business.

tion 1231 (b) (3) (B).[4] He alludes to a situation analogous to the sale by a cattle breeder of animals which have become unfit for breeding or have been used for breeding and subsequently are sold.

We reject this contention on two grounds. First, bees are by implication excluded from the definition of "livestock." Section 1.1231–2 (a) (3), Income Tax Regs., includes only mammals, such as "cattle, hogs, horses, mules, donkeys, sheep, goats, fur-bearing animals, and others mammals." It specifically excludes "poultry, chickens, turkeys, pigeons, geese, other birds, fish, frogs, reptiles, etc." This impliedly excludes all lower forms of life. Bees are insects, and thus they are excluded. Second, even if the bees are treated as "livestock," the bee larvae sold by petitioner do not qualify for capital gains treatment. The larvae held over by petitioner for breeding purposes were not sold. They were allowed to mature and reproduce. Their offspring larvae were sold. Petitioner's reliance on *Glenn E. Magee*, 17 T.C. 1583 (1952), and *Vaughan* v. *Commissioner*, 333 F.2d 714 (C.A. 9, 1964), is misplaced.

3. *Deduction for cost of bee larvae bought in one year and sold in another.*—In addition to bee larvae raised by petitioner, he purchased larvae for resale purposes in 1967 and 1968. Each year some of the bee larvae were held over to the following year. At issue is whether it is proper for petitioner to deduct the cost of these larvae in the year of purchase or whether it must be offset against the selling price in the year of sale.

Petitioner was on the cash receipts and disbursements method of accounting in the years 1967 and 1968. Such a method of accounting is permissible under section 446 of the Code. Petitioner was in the business of farming in those years. He testified that about 80. percent of his time was spent in "farming" and the other 20 percent in the bee business. The raising of bees is considered farming. Sec. 1.6073–1 (b) (2), Income Tax Regs. Consequently, the petitioner, as a cash basis "farmer," is subject to the following restriction imposed by section 1.61–4 (a), Income Tax Regs:

The profit from the sale of livestock or other items which were purchased is to be ascertained by deducting the cost from the sales price in the year in which the sale occurs, * * *

---

[4] SEC. 1231(b). DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

\* \* \* \* \* \* \*

(3) LIVESTOCK.—Such term includes—

\* \* \* \* \* \* \*

(B) other livestock, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 12 months or more from the date of acquisition.

See *D. E. Alexander*, 22 T.C. 234, 241 (1954), where this Court said:

> Although petitioner contends that under what may be called a pure cash method of accounting, purchases are regarded as costs chargeable against income in the period in which payment is made, the regulations do not give the petitioner an option to account for, and to report income on, a pure cash basis. If petitioner elects to report on a cash basis, he must do so in the manner prescribed by the regulations and subject to the limitations contained therein. The fact that the regulations require a departure from a pure cash basis is not significant. * * *

Accordingly, we conclude that the proper period of deduction for bee larvae which were purchased for resale is the year of sale. Having reached this conclusion, we must determine what amount was carried over from 1967 to 1968 and from 1968 to 1969. Since the petitioner only carried his purchased bee larvae over for one winter, selling them in the following spring, the amount of purchase price to be deferred in each year would be the amount of inventory he had on hand at the end of the taxable year. A revenue agent, working with the petitioner, determined that the carryover values from 1967 to 1968 and from 1968 to 1969 were $3,000 for each year. It was also determined that the inventory was as accurate as could have been made under the circumstances. In any event, it is the only amount presented to the Court. It therefore follows that the petitioner is not entitled to deduct the cost of larvae purchased for resale in the year of purchase but must offset such price against the selling price in the year of sale; and, further, that the amount of carryover in each year was $3,000.

To reflect the stipulation with respect to income averaging and the conclusions reached herein on the disputed issues,

*Decision will be entered under Rule 50.*