MAURICE F. FABIANI and IRMA R. FABIANI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent EUGENE T. PESCE and ERMINIA F. PESCE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fabiani v. Commissioner
Docket Nos. 376-71 and 377-71
United States Tax Court
T.C. Memo 1973-203; 1973 Tax Ct. Memo LEXIS 83; 32 T.C.M. (CCH) 941; T.C.M. (RIA) 73203; September 13, 1973, Filed Alan L. Schiff, for the petitioners. John O. Tannenbaum, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases the respondent determined the following Federal income tax deficiencies: 2 Petitioners
Docket No.
Year
Deficiency Maurice F. and Irma R. Fabiani
376-71
1967
$26,109.63
Eugene T. and Erminia F. Pesce
377-71
1967
11,008.29
The principal issue for decision is whether a 92 acre tract of land owned by petitioners was held primarily for sale to customers in the *84 ordinary course of business so that their gain upon condemnation of the land would result in ordinary income, or whether the land was held as an investment, in which case petitioners would be entitled to capital gain treatment. If it is found that the property was held by petitioners primarily for investment purposes, then we must decide whether their failure to reinvest the condemnation award in like-kind property within the period required by section 1033(a), Internal Revenue Code of 1954, [1] precludes them from deferring recognition of the gain realized upon condemnation. FINDINGS OF FACT Some facts have been stipulated by the parties and are found accordingly. Maurice F. Fabiani and Irma R. Fabiani (herein called petitioners) are husband and wife whose legal residence was in Waterbury, Connecticut, when they filed their petition in this proceeding. 3 They filed their joint Federal income tax return for the calendar year 1967 with the district director of internal revenue in Hartford, Connecticut. Subsequently, on July 22, 1968, petitioners *85 filed an amended Federal income tax return for calendar year 1967 with the director of the internal revenue service center in Andover, Massachusetts. Eugene T. Pesce and Erminia F. Pesce (herein also called petitioners) are husband and wife whose legal residence was in Waterbury, Connecticut, when they filed their petition in this proceeding. They filed their joint Federal income tax return for the calendar year 1967 with the district director of internal revenue in Hartford, Connecticut. Subsequently, on June 28, 1968, petitioners filed an amended Federal income tax return for calendar year 1967 with the director of the internal revenue service center in Andover, Massachusetts. Petitioners Maurice F. Fabiani, Eugene T. Pesce and Erminia F. Pesce were members of a partnership known as Face Homes, located in Waterbury, Connecticut. Face Homes filed its Federal income tax return for calendar year 1967 with the district director of internal revenue in Hartford, Connecticut. From the time Face Homes commenced business on April 1, 1955, it has been its practice to purchase land, subdivide it into building lots, erect homes on the lots and then sell the homes in 4 the ordinary *86 course of business. On June 4, 1957, petitioners Maurice F. Fabiani and Eugene T. Pesce, doing business as Face Homes, purchased a 92 acre tract of land suitable for residential home development. The land was located on either side of Hop Brook in the towns of Waterbury and Middlebury and was acquired at a cost of $18,000. Petitioners had been interested in purchasing the acreage for a number of years prior to 1957 and at the time of the purchase they were engaged in developing land to the northeast of the 92 acre tract. The separate project to the northeast was not continguous to the 92 acre tract but involved the conversion of raw land into a completed housing development. Prior to their purchase of the 92 acre tract petitioners had never acquired raw land without developing it and, except for a pre-1954 landscaping business, they had never been engaged in any business other than residential home development. In 1956, as a result of serious flooding that had occurred in Connecticut in 1955, Congress proposed that the Army Corps of Engineers study the need for flood control projects in the Naugatuck River Basin. On December 11, 1956, the Corps of Engineers held a public hearing *87 in Waterbury, Connecticut, to determine the need for flood control in the Waterbury area. At that meeting it was proposed by the chairman of the Naugatuck Valley River Control Commission that a dam be built somewhere along Hop Brook, a tributary of the 5 Naugatuck River. There was considerable opposition to this proposal, however, so that when the petitioners purchased the land in June of 1957 they were uncertain as to whether or not a dam would ever be built on Hop Brook and if one was built they had no idea where along the brook it would be built. Less than 2 months after petitioners purchased the property along Hop Brook they applied to the City of Waterbury for a change of zone classification on a portion of the property from residential to industrial. Eleven days later, on August 12, 1957, petitioners made a similar request to the Town of Middlebury. On October 1, 1957, the application to the Town of Middlebury was denied and on December 30, 1957, the application to the City of Waterbury was approved. Similarly, in April of 1958 petitioners sought to have an additional portion of the tract in Waterbury zoned industrial and on December 7, 1959, the application was approved. *88 Thus by December of 1959, of the total 92 acre tract, 12 acres in Waterbury had been rezoned to industrial while 7.3 acres in Middlebury had been denied a zone change to industrial. On July 14, 1960, Congress passed the Flood Control Act authorizing that a flood control project be built on Hop Brook. However, as late as January of 1962, newspaper accounts indicated that the Middlebury community was apparently still uncertain as to whether a dam would ever be built in the Hop Brook area. At the 6 time, petitioner Maurice Fabiani stated that the community should seek to "find out definitely if the dam is going to be built." He also stated at that time that he could not develop his land because the dam proposal was still alive and that he would lose the property if the dam was built. The Waterbury Republican of January 24, 1962, stated that Fabiani "owns land figuratively in the shadow of the proposed dam," and it paraphrased him as stating that "only one or two homes have been put up in the project area since the dam was proposed and that he wouldn't build there with the possibility that a dam might be built, thus forcing relocation." Ten months later Fabiani signed a Right-of-Entry *89 for Survey and Exploration allowing the Corps of Engineers to survey the 92 acre tract. At about the same time a neighboring land owner had applied to the Waterbury City Plan Commission for permission to subdivide some property to the northwest of the 92 acre tract. His application was denied on advice of the Corps of Engineers that a portion of the planned subdivision was "within the project area." Over a year later, on October 19, 1964, the Corps of Engineers formally announced that the Hop Brook Dam and Reservoir Project would be built.On July 30, 1965, the United States of America ordered appraisals of the 92 acre tract owned by petitioners and on February 1, 1967, petitioners were served with a Notice of Condemnation. Petitioners received a condemnation award of $70,500 for the 92 acres 7 and on its 1967 partnership tax return Face Homes claimed a capital gain of $52,500 ($70,500 condemnation award less $18,000 basis in land). The partnership further elected to defer recognition of the $52,500 gain in accordance with the provisions of section 1033 relating to involuntary conversions. Subsequent to receiving the $70,500, petitioners filed an action against the United *90 States seeking an increased condemnation award. The basis of the action was that the land had been reappraised as residential development property by three real estate appraisers who had valued the land at between $185,000 and $1,000,000. In 1973 petitioners received an additional award of $83,500. Respondent determined that the partnership income for the year 1967 should be increased by $52,500 because it was not entitled to capital gain treatment and could not defer recognition of the gain under section 1033. ULTIMATE FINDINGS 1. At the time petitioners received the condemnation award the 92 acre tract was held as an investment and was not held for sale to customers in the ordinary course of their business. 2. Because of their failure to reinvest the condemnation proceeds in property of a like-kind within the required period, petitioners are not entitled to defer recognition of gain under section 1033. 8 OPINION Respondent contends that petitioners held the 92 acre tract of land for sale to customers in the ordinary course of business and thus upon its condemnation the gain realized is properly reportable as ordinary income. In opposition the petitioners argue *91 that the property was acquired and held continuously as an investment and that the gain realized upon the property's condemnation is thus a capital gain. Alternatively, petitioners claim that, even if it is determined that the land was initially acquired for sale to customers in the ordinary course of business, their primary objective in holding the land changed due to the denial of their request for zoning change and to the very real threat in early 1962 of the dam being constructed near their property. The question of whether realty is held for sale to customers in the ordinary course of business has been litigated numerous times and the courts have repeatedly emphasized that each case must be decided on its own facts, and that no one circumstance or factor is controlling. Commissioner v. Pontchartrain Park Homes, Inc., 349 F.2d 416 (C.A. 5, 1965), affirming a Memorandum Opinion of this Court; Bauschard v. Commissioner, 279 F.2d 115, 118 (C.A. 6, 1960), affirming 31 T.C. 910 (1959); Friend v. Commissioner, 198 F.2d 285, 287 (C.A. *92 10, 1952); Rubino v. Commissioner, 186 F.2d 304 (C.A. 9, 1951), certiorari denied 342 U.S. 814 (1951). To resolve the 9 question of whether the 92 acre tract was held as an investment we must examine the evidence presented by the parties. Since respondent's determination is presumptively correct, the burden is on petitioners to show that the property was held as an investment and not for sale to customers in the ordinary course of business. Alice E. Cohn, 21 T.C. 90, 99 (1953), affd. 226 F.2d 22 (C.A. 9, 1955). It is the longstanding position of this Court that a taxpayer in the real estate business may hold land for investment purposes. In Casalina Corporation, 60 T.C. No. 73 (1973) at 17, we recently quoted with approval our earlier statement in Eline Realty Co., 35 T.C. 1, 5 (1960) that: It is well established that a dealer in real estate may occupy a dual role: He may be a dealer with reference to some of his properties, and an investor as to others. Charles E. Mieg, 32 T.C. 1314, 1321; *93 D. L. Phillips, 24 T.C. 435; Walter R. Crabtree, 20 T.C. 841; Nelson A. Farry, 13 T.C. 8. The characterization of any particular asset as one held for sale or as an investment is a question of fact, which is resolved with the aid of certain well recognized tests, among which are: The intent of the seller with respect to the particular asset in question; the purpose for which the property was acquired, held, and sold; the volume, frequency, continuity and substantiality of the sales; the proximity of sale to purchase; and the extent of sales activity on the part of the seller or his agents. These factors must be viewed in light of all the facts; no single factor is controlling. W. T. Thrift, Sr., 15 T.C. 366; Boomhower v. United States, 74 F. Supp. 997. 10 Equally as important to our resolution of the issue is the realization that the capital gain provisions, being exceptions to the normal tax rates, are to be narrowly construed, Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955); that these provisions *94 were adopted to relieve taxpayers from the burden of highly graduated rates imposed upon gains which were realized in a given tax year but which resulted from gradual appreciation over a long period of time, Burnet v. Harmel, 287 U.S. 103, 106 (1932); and that section 1221 is intended to distinguish between those situations where the taxpayer's profit is expected to arise merely from appreciation over a period of time and those in which it arises from the taxpayer's actions and activities with regard to the property. George R. Kemon, 16 T.C. 1026, 1032-33 (1951); Frank v. Commissioner, 321 F.2d 143, 151 (C.A. 8, 1963); Galena Oakes Corporation v. Scofield, 218 F.2d 217, 220 (C.A. 5, 1954). Initially we must consider the primary reason the property was acquired because, although it is not determinative, it does have an evidentiary bearing on the purpose for which the land was held at time of sale. After a careful examination of the entire record, we find that petitioners did not have a single purpose in acquiring the entire 92 acre tract but rather had two distinct purposes with regard to different portions of the land. *95 11 Petitioners are residential land developers who develop and improve raw land and build homes on the improved land for sale in the ordinary course of their business. Within 3 months of the time they purchased the 92 acre tract, petitioners sought to have 19.3 acres rezoned from residential to industrial property. Petitioners intended and planned at some time in the future to develop the 19.3 acres for industrial purposes and to improve the land for that purpose. The record does not show whether petitioners planned to sell the industrial property once it was developed and improved or whether they planned to retain the property, merely leasing it to industrial concerns. In either case, we think the petitioners' planned activity with regard to the 19.3 acres should not be considered to be part of their ordinary course of business. If petitioners held the 19.3 acres for future rental purposes, then it clearly would be considered to be a capital asset used in the trade or business. On the other hand, if petitioners planned to sell the improved industrial lots, then the extent of their activity would control whether or not such sales could be considered to be in the ordinary *96 course of business. We recognize that a taxpayer may be engaged in more than one business and thus the fact that a taxpayer is primarily a developer of residential property does not necessarily preclude a finding that sales of improved industrial property would not also be within his ordinary course of business. 12 Charles A. Sykes, 57 T.C. 618, 625 (1972). We feel, however, that because of petitioners' extensive residential development, and in view of the facts herein, petitioners' development and improvement of the 19.3 acres as industrial property would not be sufficient to be considered a separate trade or business and thus sales of the industrial property could not be considered to be within the ordinary course of business. Consequently, we conclude that petitioners acquired the 19.3 acres for investment purposes and not for sale to customers in the ordinary course of business. With regard to the remaining 72.7 acres it is more difficult to discern petitioners' intent in acquiring the land. All of their past business practices indicate that the land was acquired for *97 development purposes but petitioners' actions subsequent to purchase did not conform with their prior practices. Petitioners had consistently subdivided and developed newly acquired land shortly after purchase, but they did neither with respect to the Hop Brook property. There is conflicting testimony regarding exactly what the petitioners' intentions were when the property was acquired. Since the record does not clearly show that they lacked the intent to develop the 72.7 acres, it is our view that the petitioners have failed to meet their burden of proving that the property was purchased for investment purposes. Alice E. Cohn, supra.Mr. Fabiani stated at the trial, and there was no objection to respondent's requested 13 finding of fact, that at the time petitioners purchased the property they were uncertain as to whether or not a dam would ever be built on Hop Brook and, if one was eventually built, where it would be built. Accordingly, we find that at the time of purchase there existed only vague speculation on the part of petitioners that a dam might be built somewhere along Hop Brook, and therefore they acquired the 72.7 acres, not for purposes of capital *98 investment, but rather as farsighted developers seeking to replenish their inventory of raw land. See Corn Products Co. v. Commissioner, supra at 47, 50-53; and Mansfield Journal Co. v. Commissioner, 274 F.2d 284, 286 (C.A. 6, 1960), affirming 31 T.C. 902 (1959). We turn next to a consideration of the reason petitioners held the property subsequent to the time of purchase since, "while the purpose for the acquisition must be given consideration, intent is subject to change, and the determining factor is the purpose for which the property is held at the time of sale. Carl Marks & Co., 12 T.C. 1196; Richards v. Commissioner, 81 F.2d 369; Mauldin v. Commissioner, 195 F.2d 714; Raymond Bauschard, 31 T.C. 910, 917, affd. 279 F.2d 115." Casalina Corporation, supra at 17 quoting Eline Realty Co., supra at 5. The evidence with respect to the volume, frequency, continuity and substantiality of any sales, the proximity of sale to purchase, and the extent of sales or advertising *99 activity on the part of petitioners, all strongly 14 support the conclusion that petitioners did not hold the Hop Brook property primarily for sale to customers in the ordinary course of business. At no time from the date they purchased the property in 1957 until it was condemned in 1967 did petitioners ever seek to, or in fact, sell any portion of the 92 acre tract. Such lack of sales activity is an indication of investment intent. Casalina Corporation, supra at 18; Frieda E. J. Farley, 7 T.C. 198, 203 (1946). Petitioners never took any steps to subdivide or to develop any of the 92 acres and they held the land much longer than was their normal practice. Holding property for several years indicates an investment intent, Casalina Corporation, supra at 18 citing Merchants National Bank of Mobile, 14 T.C. 1375 (1950), affd. 199 F.2d 657 (C.A. 5, 1952); as does lack of any development activity on the part of the owner, Casalina Corporation, supra at 18 citing Charles E. Mieg 32 T.C. 1314, 1321 (1959); Scott v. United States, 305 F.2d 460 (Ct. Cl. 1962); cf. Walter H. Kaltreider, 28 T.C. 121, 125 (1957), *100 affd. 255 F.2d 833 (C.A. 3, 1958); Estate of M. A. Collins, 31 T.C. 238 (1958). Thus, after acquiring the 92 acre tract petitioners did none of the things they had done in the past subsequent to the purchase of raw land. This lack of any activity by them reflected their belief that there was a strong likelihood that their property would be made unsuitable for development purposes because of the proposed dam. We feel that 15 at least by the time the Hop Brook project was formally announced in 1964, and probably even earlier, the petitioners were holding the land primarily for investment purposes. The term "primarily" was defined in Malat v. Riddell, 383 U.S. 569 (1966), to mean "principally" or "of first importance." In our judgment petitioners' principal intent at the time of sale for holding the land was not for development but for investment purposes. Mr. Fabiani stated in January of 1962 that he would not build in the Hop Brook area with the possibility that the construction of a dam might force relocation. We are not convinced that petitioners continued to hold the property for 5 more years primarily for sale to customers in the *101 ordinary course of business since as time passed they became more and more certain that the dam would actually be built near their property. Respondent relies heavily on Juleo, Inc. v. Commissioner, F.2d (C.A. 3, June 27, 1973), reversing T.C. Memo. 1971-68, and invites us to reconsider our opinions in that case and the related cases of Ridgewood Land Co., Inc., T.C. Memo. 1972-16, affd. 477 F.2d 135 (C.A. 5, 1973); and Tri-S Corp., 48 T.C. 316 (1967), affd. 400 F.2d 862 (C.A. 10, 1968). In Juleo we found that notification by the State of New Jersey that land held by the taxpayer was subject to condemnation was sufficient to change the purpose for which the taxpayer held the land. The taxpayer in Juleo had purchased and held the land primarily for sale to customers in the ordinary course of business, but after receiving the 16 condemnation notice we found that its purpose for holding the land changed to one of investment. The Court of Appeals for the Third Circuit reversed, holding that "A condemnation notice does not change land held primarily for sale to customers in the ordinary course of business into *102 a capital asset." Juleo, Inc. v. Commissioner, supra. The Court relied on the fact that if there had been no condemnation the land would have been sold as part of a development and the proceeds treated as ordinary business income. We think the Juleo case is distinguishable from this case because in Juleo the taxpayer began development shortly after the property was purchased. Subdivision maps were filed, engineering work was done, and approval for subdivision was obtained. Three years after purchase the taxpayer became aware of condemnation plans of the State of New Jersey and discontinued development on the portion to be condemned. However, the taxpayer went forward on the balance of its surrounding property, advertising the lots for sale and in fact selling lots to customers in the ordinary course of business. The facts in Juleo go beyond those in this case. Petitioners never filed subdivision maps, never did any engineering work, never advertised the property for sale and never sold any of the property. Unlike the property in Juleo, the Hop Brook property was not part of a development at the time of condemnation and had never been. Therefore, petitioners' sale of the 92 *103 acre tract was properly reported as the sale of a capital asset. 17 In Juleo the respondent argued that since the taxpayer had sought to base the amount of the condemnation award on what it would have received if the land had been sold as developed lots, the property should have been found to have been held for sale to customers in the ordinary course of business. The respondent asserts the same argument here. The record in this case, however, shows that the basis of the claim for the increased award was not what petitioners would have received if they had sold the property as developed land but rather the value of the land as residential property. Thus the award was increased to reflect what a developer would have paid to acquire the 92 acre tract for purposes of residential development, not what petitioners would have received upon sale of the property as developed lots. Again, on this point we also think the instant case is distinguishable on its facts from the Juleo case. Since we have found that prior to receiving the condemnation notice petitioners held the Hop Brook property as an investment, it is unnecessary for us to consider whether receipt of a condemnation *104 notice can change the reason for which property is held. Accordingly, we decline to accept respondent's invitation to reconsider our decisions in Tri-S Corp., Ridgewood Land Co., Inc. and Juleo, Inc. Respondent argues that even if petitioners are entitled to capital gain treatment, they cannot defer recognition of gain 18 under section 1033(a) because they failed to offer any evidence that they reinvested the condemnation award in property of a "like kind." Sections 1033(a) (3) (A) & (B) clearly require that in order to be entitled to nonrecognition treatment the taxpayer must reinvest a condemnation award within 2 years of the close of the first taxable year in which any part of the gain upon condemnation of the property is realized. Petitioners have presented no evidence to establish that the condemnation award was reinvested prior to December 31, 1969, in property of a like-kind, and therefore they are not entitled to defer recognition of the capital gain of $52,500. In summary, we hold that at the time of condemnation the petitioners held the 92 acre tract primarily for investment *105 purposes and thus the gain upon receipt of the condemnation award was properly reported by them as a capital gain. We also hold that since the petitioners did not reinvest the proceeds in property of a like-kind prior to December 31, 1969, they must recognize the entire $52,500 capital gain in the taxable year 1967, the year they received the award. To reflect our conclusions herein, Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩